# CHARLES HAST v. TERRITORY.

No. 1502, Okla. T.    Opinion Filed March 7, 1911.

(114 Pac. 261.)

1.  **RAPE—Female Under 18 of Previous Chaste Character—Sufficiency of Indictment.** Where an indictment charges a defendant with having had sexual intercourse with a female under the age of 18 years, not the wife of the perpetrator, and of previous chaste and virtuous character, it sufficiently charges an offense under the second paragraph of section 2353 of Snyder's Comp. Laws of Oklahoma 1909.

2.  **TRIAL—Necessity for Arraignment—Appeal—Case-Made—Correction.**  (a) Where the record shows that a defendant was present and represented by counsel and aided and assisted in the selection of the jury and the cross-examination of witnesses for the state and introduced evidence in his own behalf, and the issues of the case were properly submitted to the jury by the court, it is immaterial as to whether or not the record shows that the defendant was formally arraigned.

    (b) It is the duty of the trial court before approving the case-made to incorporate in the case-made a statement as to any matter which may·have occurred in open court during the trial and of which the trial judge has knowledge, which should be shown by the case-made, and which may have been omitted by counsel in making up such case-made.

3.  **RAPE—Female Under 18 of "Previous Chaste Character"—Admissibility of Evidence—General Reputation.** When a defendant is on trial for having had sexual intercourse with a female under 18 years of age, not the wife of the defendant, and of previous chaste and virtuous character, the defendant cannot attack the character of such female for virtue and chastity by proof of her general reputation, but he is permitted to prove, if he can, any specific act indicating a want of chastity or virtue upon the part of such female. The real issue in such a case is not the reputation of such female, but it is as to whether as a matter of fact she was chaste and virtuous prior to such intercourse.

4.  **RAPE—Sufficiency of Evidence.** For evidence which fully sustains the verdict of the jury in convicting a defendant for having sexual intercourse with a female under 18 years of age and of previous chaste and virtuous character, see testimony stated in the opinion.

(Syllabus by the Court.)

*Appeal from District Court, Pottawatomie County; B. F. Burwell, Judge.*

Charles Hast was convicted of rape, and he appeals. Reformed and affirmed. See, also, 3 Okla. Cr. 339, 105 Pac. 1118.

Appellant was convicted for the offense of rape in the district court of Pottawatomie county, and his punishment was assessed at confinement in the penitentiary for the period of six years. This conviction took place in the territorial court in 1903. Defendant prosecuted an appeal to the Supreme Court of Oklahoma Territory; but the case was not disposed of by that court prior to the incoming of statehood. This case was transferred to the Supreme Court of Oklahoma. Upon the creation of this court the case was transferred by the Supreme Court to the Criminal Court of Appeals of Oklahoma. Prior to this transfer, however, the record had been returned to the district court of Pottawatomie county by order of the Supreme Court for the purpose of making some corrections therein, and by some means said record became lost and has only recently been found. This explanation is deemed proper to explain the long delay in deciding this case. Affirmed.

The following are the instructions given:

"Gentlemen of the jury, the Court instructs you as follows:

"This is a prosecution by indictment by the territory of Oklahoma against the defendant, Charles Hast, for the crime of rape, as fully set out and charged in the indictment.

"To this indictment the defendant has pleaded not guilty; and it is your duty to determine from the evidence, under the instructions of the court, as to whether the defendant is guilty or innocent of the crime of which he stands charged.

"It is incumbent upon the territory to prove each material fact necessary to constitute the guilt of the defendant of the crime charged, and to prove each material allegation of the indictment beyond a reasonable doubt. Nothing can be presumed or taken by implication against the defendant.

"A 'reasonable doubt' is that state of the case which, after a full, fair and, impartial consideration of all the evidence, leaves the minds of the jurors in that condition that they cannot say

that they feel an abiding conviction to a moral certainty of the truth of the charge; that is, to a certainty that convinces and directs the understanding and satisfies the reason and judgment of those who are bound to act conscientiously upon it.

" 'Rape' is an act of sexual intercourse accomplished with a female not the wife of the perpetrator, where the female is over the age of 16 years and under the age of 18 years and of previous chaste and virtuous character; and rape committed upon a female between the ages of 16 and 18 years, even though the sexual intercourse is with the consent of the female, is rape in the second degree. And in this case the court instructs you that if you find from the evidence beyond a reasonable doubt that the defendant, within this county and territory, did, unlawfully, wilfully, and feloniously, have sexual intercourse with the prosecuting witness, as charged in the indictment, and that prior to the time charged against the defendant (the prosecuting witness was of previous chaste and virtuous character), and was at the time under *18 years of age, then and in that event you should find the defendant guilty of rape in the second degree; and in this connection the court instructs you that under the law a female of previous chaste and virtuous character is one who has never had sexual intercourse with a man or a, male person, and if you should entertain a reasonable doubt as to whether the defendant had sexual intercourse with the prosecuting witness as charged in the indictment, or as to whether the prosecuting witness had had sexual intercourse with some other male person prior to the time that the defendant had intercourse with her, if you find that he had sexual intercourse with her as charged in the indictment, then and in that event you should acquit him. But it is for you to determine the guilt or innocence of the defendant in this case in the light of all the facts and circumstances appearing upon the trial.

"You are further instructed that, while one can be convicted upon the testimony of a prosecuting witness in a case of this kind, yet, unless the testimony of the prosecutrix is corroborated by evidence which is clear and satisfactory, it is the duty of the jury to receive the testimony of such prosecuting witness with great caution; and, in any event, the jury should be fully satisfied, by the degree of evidence stated in these instructions, that the defendant is guilty of the crime charged against him, before returning a verdict to that effect. However, it is for the jury to say, in the light of all the evidence, as to whether the story detailed by

the prosecuting witness is reasonable or unreasonable, and as to whether it had been corroborated by the testimony of other creditable witnesses. Take up the consideration of this case with an honest determination to arrive at the truth of the matter submitted to you, for, if the defendant is guilty, and his guilt established by the evidence, and to the degree stated in these instructions, you should have the courage of your honest convictions, and so find But, on the other hand, so long as you entertain a reasonable doubt of the guilt of the defendant, you should decline to find him guilty. What the law demands is that you consider all of the testimony introduced upon the trial, and discuss it as honest conscientious men, and if possible return a verdict which will speak the truth.

"You are the sole judges of the weight of the evidence and the credibility of the witnesses, and the law is that, when two or more witnesses testify directly opposite to each other, you are not bound to regard the weight of evidence as evenly balanced; but, in determining the weight and credit that should be given to the testimony of any witness, you may take into consideration his or her appearance upon the stand, his, or her interest in the result of the action, and, together with all of the other facts and circumstances appearing upon the trial, determine the weight and credit that should be given to the testimony of any witness, and give credit accordingly.

"You are further instructed that, if you find and believe that any witness has wilfully testified falsely relative to any material matter in issue, you may disregard all the testimony of such witness, except in so far as it may be corroborated by the testimony of other creditable witnesses, or by that of another creditable witness, or by some other fact or circumstance appearing upon the trial.

"You should consider these instructions all together; you have no right to consider any part or parts of them to the exclusion of other portions thereof.

"When you shall have retired to your jury room, you must select one of your number as a foreman, and, when you shall have agreed upon a verdict, he will sign it as such, and you will all return with it into court. Unless you all agree, no verdict can be found. Forms of verdict will be handed you by the court."

*L. G. Pitman,* for appellant.

*P. C. Simons,* Atty. Gen., for the Territory.

FURMAN, PRESIDING JUDGE. (after stating the facts as above). First. The charging part of the indictment is as follows:

"Charles Hast, late of Pottawatomie county and within the jurisdiction of this court, did unlawfully, wilfully, and feloniously have sexual intercourse with one Etta Hindman; she, the said Etta Hindman, being then and there an unmarried female under the age of 18 years, not the wife of the defendant, and of previous chaste and virtuous character."

Counsel for appellant demurred to the indictment because it omitted to charge that the prosecuting witness was over the age of 16 years and under the age of 18 years. This indictment was based on section 2353, Snyder's Comp. Laws of Okla. 1909, the portion of which relating to this offense is as follows:

"Rape is an act of sexual intercourse accomplished with a female, not the wife of the perpetrator, under either of the following circumstances: (1) Where the female is under the age of sixteen years. (2) Where the female is over the age of sixteen years and under the age of eighteen, and of previous chaste and virtuous character."

The first section of the statute makes the offense complete when sexual intercourse is had with a female under 16 years of age without regard to the consent of the female and without reference to force or violence on the part of the defendant or resistance upon her part. If any man in Oklahoma has sexual intercourse with a female, not the wife of the perpetrator, who is under the age of 16 years, such act of sexual intercourse constitutes rape, and no defense can be made to the act. The second section of the statute, when the female with whom such intercourse is had is over 16 years of age and under 18 years of age, does not constitute rape, unless the state proves that she was of previous chaste and virtuous character. When this is proven, the act is rape even if the female consents to such intercourse. This statute does not apply to any one who has sexual intercourse with a harlot over the age of 16 years, but only punishes him who would despoil the innocent of her virtue; provided the woman with whom such intercourse is had is under the age of 18 years. The indictment charges the offense under the second section of the statute defin-

ing rape.  Under this indictment the defendant could not have been convicted under the first section of the statute.  We do not see how the defendant could have been injured by the failure of the indictment to allege that the female was over the age of 16 years.  Any person of common understanding would know from this indictment what offense was intended to be charged.  This being the case, the indictment is sufficient under paragraph 6 of section 6704, Snyder's Comp. Laws of Okla. 1909.  It is only when the indictment charges that she is under the age of 16 years that sexual intercourse constitutes rape without reference to the question of force or violence or the consent of the female or the question of her previous chaste and virtuous character.  The trial court therefore did not err in overruling the demurrer to the indictment.  Upon the trial of this cause it was proven that the injured female was over 16 years of age and under 18 years of age at the time of the alleged commission of this offense.

Second.  The appellant contends that a new trial should be granted him because the record fails to affirmatively show that he entered a plea to the indictment, and cites a number of authorities in support of this contention.  The record, however, shows that the appellant was present and represented by counsel and aided and assisted in the selection of the jury in the case and in the cross-examination of the witnesses for the state and the introduction of evidence in his own behalf, and that the issues in the case were properly submitted to the jury by the court, and the instructions of the court to the jury, which are a part of the record by our statute, state that the defendant had pleaded not guilty to the charge against him.  Under these conditions, it is immaterial as to whether or not the record affirmatively shows that the defendant was arraigned.  See *Sam Wood v. State,* 4 Okla. Cr. 436, 112 Pac. 11.  But, even if this was not the case, we find that, when the case-made was presented to the court the trial judge, before approving the same, made the following correction therein:

"The foregoing case-made is corrected as follows:  At the time the defendant's case was called for trial, and before the trial began, the defendant, being present in person in court and being

represented by counsel, entered a plea of not guilty to the indictment in this case, having heretofore been duly arraigned, and the indictment having been read to him by the clerk of the district court."

Counsel for appellant contend that the court erred in inserting the above explanation in the case-made. We cannot agree with this contention. For a correction of the case-made by statement by the trial judge, see *Simmons v. State,* 4 Okla. Cr. 490, 112 Pac. 35. When a defendant is arraigned, it is done in the presence of the court. It is only when it is desired to make matters of which the court has no personal knowledge a part of the record that it is permissible to introduce affidavits or testimony as to the existence of such matters. In the case of *Cochran v. State,* 4 Okla. Cr. 379, 111 Pac. 974, this court said:

"Matters occurring in open court in the course of a trial of which the judge must have knowledge cannot be incorporated in the record by affidavits, but must be made a part of the case-made by proper recitals duly certified to by the trial judge."

Third. Counsel for appellant attempted to prove a want of virtue and chastity upon the part of the prosecuting witness by evidence of her general reputation in the neighborhood in which she resided. The court at the time stated to counsel for appellant that he could prove any specific act indicating a want of chastity or virtue upon the part of the prosecuting witness, but that testimony of her general reputation was not admissible. Appellant excepted to the ruling of the court. We have heretofore passed upon this precise question. In the case of *Marshall v. Terr.,* 2 Okla. Cr. 148, 101 Pac. 144, Special Judge Fulton, speaking for this court, said:

"On the question of previous chaste and virtuous character, in one sense 'character' is what a person really is; it is that real condition that constitutes character. In another sense, 'character,' such as is capable of being measured and determined from reputation, is that which a person is supposed or is estimated to be. 5 Am. & Eng. Enc. of Law (2d. Ed.) p. 852, and cases cited. In cases of seduction, the previous chaste character of the woman seduced is one of the essential elements of the offense. Under statutes like our own, it has been held to require the injured female

should be actually chaste, and not merely have a good reputation in that respect. This should be so because it is a protection and shield to the pure and virtuous woman. She may be falsely accused, as many men and women are in this day. That a false condition should license the libertine to take advantage of a chaste female would be revolting; such law would fall short of being righteous and just. The law does not uphold the work of the scandal monger, or character assassin. The following cases uphold this conclusion: 'One of the essential elements of the crime in this class is that the female assaulted must have been of previous chaste and virtuous character. This law is for the protection of the girl of tender age and immature judgment who is pure, chaste, and virtuous. A male person who indulges in sexual intercourse with such female not his wife is classed by the law alongside of one who forcibly ravishes the female over 16 years of age. Elements of force, violence, or resistance do not enter into this particular class of rape.' *Young v. Territory,* 8 Okla. 525, 58 Pac. 724. 'The statute provides that in the prosecution of the seduction of an unmarried woman like the present no conviction can be had if on the trial it is proved that such woman was at the time of the alleged offense unchaste. This means actually unchaste. * * * The female must not only be unmarried, but chaste in fact when seduced.' *Hussey v. State,* 86 Ala. 34, 5 South. 484; *Kenyon v. People,* 26 N. Y. 203, 84 Am. Dec. 177. Bishop, Statutory Crimes (2d Ed.) § 639, reads: 'The seventh and ninth charges requested by defendant were, under this principle, properly refused. The word "character" used in this charge is ambiguous in meaning, and may be construed to refer to the reputation of the prosecutrix. It is therefore misleading, inasmuch as evidence of bad reputation for chastity was inadmissible to prove a want of actual virtue.' Bishop, Statutory Crimes (2d Ed.) § 639. In the case of *Lyons v. State,* 52 Ind. 426, which was a prosecution for abduction of a female for the purpose of prostitution, under statutes making it an offense to so abduct a female of previous chaste character, the court said: 'On the trial the defendant proposed to prove acts of illicit sexual intercourse on the part of the prosecuting witness prior to the alleged abduction. The court rejected the evidence. We think this was error. In such a case the female must be of previous chaste character. This has been held to mean that she shall possess actual personal virtue in distinction from a good reputation. A single act of illicit connection may therefore be shown on behalf of the defend-

ant.' In the case of *Smith v. Commonwealth*, 32 S. W. 137, 17 Ky. Law Rep. 541, the defendant was indicted and convicted of the crime of seduction under promise of marriage; the seduction being founded on the fact of the previous chaste character of the female. The court said: 'Without an extensive discussion of the testimony, it is apparent that some instruction should have been given with reference to the character of the woman whose virtue is said to have been lost by the act of the defendant. If at the time of his promise of marriage she was a lewd woman, and shortly prior she had had sexual intercourse with others, this verdict should not stand, and instruction to that effect should have been given.'

"Under a statute providing for the punishment of the seduction of an unmarried woman of previous chaste character, the court held: 'That character referred to moral qualities, and not to reputation, and evidence of reputation was not admissible upon the issue of character, but only to impeach or corroborate testimony in regard to particular acts of unchastity.' *State v. Prizer*, 49 Iowa, 531, 31 Am. Rep. 155. Under another statute, which provides 'that any man who under promise of marriage seduces any unmarried female of previous chaste character, shall be guilty of a misdemeanor,' it was said that: 'By the terms "chaste character" the Legislature could only have meant personal qualities that make up the real character, and not public reputation, which is the estimate of character formed by the public. It could not have been intended to substitute reputation for character in this its primary and true sense.' *Kenyon v. People*, 26 N. Y. 203, 84 Am. Dec. 177. In the case of *Andre v. State*, 5 Iowa, 389, 68 Am. Dec. 708, the court held as follows: 'Character in seduction statutes prescribing that the woman be of previous chaste character, such statute is for the protection of the pure-minded, for the innocent in heart, who may have been led astray, seduced from the paths of rectitude; and the jury are the sole judges in a case which comes within this description. * * * Character signifies that which a person really is, ·in distinction from that which she may be reputed to be.' In *State v. Sutherland*, 30 Iowa, 571, it was said: 'In order to determine the character of the female for chastity, it is proper to extend the inquiry, not only to the fact whether she has had previous sexual intercourse, but whether she is pure and chaste in character in her acts and habits of life.'

. "From the foregoing authorities it is apparent that it is not the general reputation of the female that she is chaste and virtu-

ous that is taken as the standard character. On the contrary, it is a condition actually existing that she is in fact chaste and virtuous. If the law presumes that the female is chaste and virtuous, this presumption merely authorizes the jury to assume at the outset that she was of such character. That the female was of a previous chaste and virtuous character is an issuable fact; and any evidence tending to overthrow the presumption of chastity is admissible, not evidence of general reputation, but any evidence that tends to establish a condition, such as above described, that amounts to character. A situation, inclination, and opportunity to engage in illicit intercourse is pertinent and admissible. The state should be required to establish the required chaste and virtuous character. This may be done by satisfactory explaining, in harmony with virtue and chastity, all apparent compromising circumstances or facts throwing suspicion on her actual character, as well in addition showing her general good reputation."

In addition to the authorities above cited, an admirable brief has been filed in this case on the part of the state, from which we make the following quotations:

"The first case to which I desire to call the attention of the court is *Kenyon v. People,* 26 N. Y. 203-209, incl. [84. Am. Dec. 177]. This was a prosecution upon an indictment for seduction under promise of marriage. The third paragraph of the syllabus in this case reads as follows: 'Evidence of the general reputation of the girl's want of chastity is inadmissible. Previous chaste character in this statute means actual personal virtue, not reputation; and can be impeached only by specific proof of lewdness.' On page 205 [of 26 N. Y., 84 Am. Dec. 177] the court says: 'The prisoner offered to prove that the character of the prosecutrix for chastity was, by general reputation among her neighbors, bad; which offer was objected to. The court excluded the evidence, and the prisoner's counsel excepted.' On page 207 [of 26 N. Y., 84 Am. Dec. 177], in the opinion of the court, we find the following: 'The defendant offered to prove on the trial that the character for chastity of the witness and prosecutrix was, by general reputation among her neighbors, bad. This was excluded, and I think properly. Evidence that a female is by reputation unchaste, is not competent by way of impeachment. * * * Nor can "character," as the term is used in the statute under which the prisoner was convicted, be proved by reputation. The statute is: "Any man who shall, under promise of marriage, seduce and have illicit

connection with an unmarried female of previous chaste character, shall be guilty of a misdemeanor," etc. "Character," as here used, means actual personal virtue, and not reputation. The female must be unmarried and chaste in fact when seduced. By the terms chaste character," the Legislature could only have meant personal qualities that make up the real character, and not public reputation, which is the estimate of character formed by the public. It could not have intended to substitute reputation for character, in this, its primary and true sense. The accused may, by proof of specific acts of lewdness on the part of the female, and not otherwise, show that she was in fact unchaste.'

"I next cite *Carpenter v. People,* 8 Barb. [N. Y.] 603. The first paragraph of the syllabus reads as follows: 'The words "previous chaste character," as used in the act of March 20, 1848, to punish abduction as a crime, mean actual personal virtue in a female, and to sustain the indictment it is necessary that she should have been chaste and pure in conduct and principle up to the time of the commission of the offense or the commencement of the acts on the part of the accused which resulted in the abduction of the female.' At the bottom of page 607 and on 608, we find the following in the opinion of the court: 'With respect to the character which the female must possess in order to constitute the statute offense by the individual taking her away, the court below advised the jury that the term "previous chaste character," in the act did not relate to or mean actual virtue; that if the female was known as a person of chaste character and reputation at the time of the abduction, though it should turn out at the trial that she had, several years previous to the alleged abduction, been guilty of a single instance of unchaste intercourse, it would constitute no defense. In this part of the charge, and particularly wherein the jury were instructed that the term "previous chaste character" did not relate to or mean actual personal virtue, we think the court erred. "Character" is defined by Webster to be "the peculiar qualities impressed by nature or habit on a person which distinguishes him from others; these constitute real character, and the qualities he is supposed to possess constitute his estimated character or reputation." '

"The next case I will cite is *Polk v. State,* 40 Ark. 482, 486 [48 Am. Rep. 17]. The fourth paragraph of the syllabus in this case reads as follows: 'Character of prosecutrix for chastity. In every prosecution for seduction, the character of the seduced is

involved, though not expressed in the statute. And this character is not her general reputation in the community, but the possession of actual personal chastity, and may be impeached by proof of particular instances of incontinence occurring before the seduction.' In the opinion of the court they say: 'In every prosecution for seduction, the character of the seduced female is involved in the issue. And "character" means, in this connection, not her general reputation in the community, but the possession of actual personal chastity. Now, Lizzie Autry made oath that she had never had unlawful commerce with any man except the defendant, and only on two occasions with him. The defendant offered to prove by Hudson, one of the state's own witnesses; by White, to whom s'e had formerly been engaged; and by several other witnesses—that she was not a virtuous woman at the time of her alleged seduction, and interrogated these witnesses as to specific acts of criminal conversation with her. But the court refused to permit the examination to proceed in this direction. The evidence was competent. All the cases agree that upon a trial for seduction the girl's chastity may be impeached by particular instances of incontinence occurring before the defendant's intimacy with her. This is in fact the best proof upon the subject. Some courts go so far as to hold that it is the only legitimate proof and exclude evidence of general reputation'—citing authorities.

"In *People v. Clark*, 33 Mich. 117, I quote from the opinion of the court: 'In most of the states their statutes make the seduction of a woman of "previous chaste character" an indictable offense, while here are no such words, nor any of like import, in ours; and the courts have held that the words "previous chaste character" mean that she was possessed of actual personal virtue in distinction to a good reputation, and that a single act of illicit connection may therefore be shown on behalf of the defendant.'

"In *People v. Brewer*, 27 Mich. 134, the court says: 'It does not therefore become necessary for us to consider whether the woman's reputation at the time or previous to the alleged offense could be proved or not, as it is manifest that her reputation in that regard would be injuriously affected by the offense itself, when made known, so that, if a bad reputation could be made use of by the defendant, the very crime would become the means of protecting the criminal, and, the more injurious the seduction, the more certain would be the immunity from punishment.'

"In examining these authorities, I suggest to the court to

bear in mind that some of the states hold that the proof of previous chaste character is in some jurisdictions supplied by the general presumption of law that all females are of chaste character until the contrary is made to appear, while others have adopted the rule that the previous chaste character of the female, being an essential element of the offense charged, must be proven affirmatively by the state, the same as any other ingredient of the offense. The latter rule has been adopted by this territory, and I am satisfied that it is the correct one. The presumption of innocence is the strongest presumption known to the law and extends to each and every element of a crime charged, and I do not believe that the rule adhered to by some of the courts is correct, wherein they permit the presumption of chastity to furnish proof of one element of the offense charged, thereby allowing one presumption to overcome another. And I only mention this matter that the court may bear it in mind in distinguishing the conflict of authorities upon the proposition involved in this case.

"The next case I cite is *Zabriskie v. State,* 43 N. J. Law, 645, 646 [39 Am. Rep. 610] : 'The New York cases hold the words "previous chaste character" in the statute of that state to mean actual personal virtue, and not reputation, which is the estimate of character formed by the public. There is a distinction between actual personal virtue and "good repute for chastity," as used in our statute. The former may be preserved, while the latter is impaired by indiscreet conduct. It does not necessarily follow that they are coexistent. Therefore, if presumption is permitted to dispense with the necessity for proof, the fact of her good repute, as well as her personal chastity, must be presumed.'

"The case above cited is one of the strongest decisions which I have read and adopts the rule that the state must affirmatively prove the good character of the prosecuting witness. But it will be observed that the language of the statute of New Jersey makes it indictable to seduce a female of good repute for chastity, and the court will bear this distinction in mind in examining this case, as I concede that, where the statute uses the expression 'good repute for chastity,' evidence of her reputation would be competent, but where, on the contrary, the statute uses the expression 'previous chaste and virtuous character,' or 'previous chastity,' then it excludes the question of reputation and confines the issues to the actual personal chastity of the prosecutrix.

"The case of *State v. Prizer,* 49 Iowa, 532 [31 Am. Rep. 155],

is one of the most vigorous opinions upon this subject found in the books. I will quote liberally from the opinion of the court as it is very much in point. It reads as follows: 'The statute under which defendant was convicted prescribes · punishment for seducing and debauching "any unmarried woman of previous chaste character." The word "character," as ` here used, refers, not to her reputation, but to her real moral qualities. The language of a prior decision of this court aptly expresses the true meaning of the word, viz.: "We think the statute intended · to use the term 'character' in its accurate sense, and as signifying that which the person really is in distinction from that which she may be reported to be:" *Andre v. State,* 5 Iowa, 389-394 [68 Am. Dec. 708]. The crime of seduction is committed when a really chaste woman is induced, by means which may overcome the virtuous, to submit to the embrace of her temptor. To determine whether the crime has been committed, the true character of the woman must be ascertained. It must be known whether she be really chaste or otherwise. The reputation of a man or woman does not always accord with the true character of the individual. The good and pure are often traduced by bad men and women and suffer in reputation by reports invented and circulated through motives having their origin in envy, malevolence, and hate. The reputation of a woman is especially exposed to such assaults, and consequently, having its origin in falsehood and imagination, has no limit to its circulation, and the unfortunate subject of the slander will usually hear no voice from her own sex lifted up in her defense. A direct and confidently asserted charge of impurity is usually accepted by womankind as evidence of want of virtue, and often the poor suffering victim of slander is driven from society by the good and pure of her own sex without evidence of guilt. This sad truth is familiar to all. It is strange indeed that the heart of woman, so tender toward the afflicted, so full of charity, so forgiving and always prompting the deeds of kindness, should be closed to the victims of slander among her own sex. It may be that the inexorable laws of society which punish the slandered woman tend to protect and preserve virtue by presenting the most powerful motives for its practices, while they often inflict the most cruel injustice. The law, however, can recognize no such rules. It will aim in each case to administer justice and will protect virtue against the assaults of the slanderer, though the victim be a woman. It will not permit the lewd and vicious by falsehoods

to destroy the reputation of a woman and then to seek protection against the penalties it provides for the overthrow of her virtue under the slanders their malevolence created. But this result would be reached should the rule advocated by defendant's counsel be followed in cases of this kind. It cannot be recognized by the courts.' "

Fourth. Counsel for appellant contends that the verdict of the jury is not supported by the testimony. To this contention we cannot agree.

The prosecuting witness testified that the defendant visited her, and then proceeded as follows:

"Q. Did you have a conversation with him there in the buggy, Etta? A. Yes, sir. Q. Did he say anything with reference to the subject of love? A. Yes, sir. Mr. Carrelton: Objected to as leading. (Overruled. Exception.) Q. State what he said, Etta, to you? A. Why, he said— Well, he first began telling me what he had, and what he owned. Q. Was that in the way of property? A. Yes, sir. Q. Well, what did he say? Mr. Taylor: We object to that as incompetent. (Overruled. Exception by the defendant.) The Court: Go right ahead and tell what he said. A. He said that he owned a farm out there north of McLoud, and he owned some property there in McLoud, he said, and then he said that he was going to sell his store, his secondhand store down there that he was running, and put up a hotel; he was going to put up a two-story building, he said, and have a hotel in the lower part and beds in the upper part. Q. Well, now, just tell the jury what he said to you with reference to love. Just tell what he said about loving you, if anything. ·A. Why, he said he loved me. He said he always would until I gave him some reason not to love me. Q. What did you say to him Etta? Did you tell him that you loved him? A. Yes, sir. Q. What did he say with reference to the subject of marriage, if·anything? A. Why, he said—he asked me if I would marry him. Q. And what did you tell him? A. I told him I would when I got older. Q. Now, what else did he say to you, Etta, with reference to having intercourse with you, if anything? A. Why, he just said—I don't know whether I could tell it like he said it or not. The Court: Well, just tell as near as you can how he said it. A. He asked me if I would let him have some, and I told him I didn't want to; that I didn't think that would be right; and he said I ought to be as good to him as he was to me. He

said he would not think none the less of me, and that he thought so much of me. Q. Well, what did he do then? A. Why, he taken his hat off and put it on my head, and put his arms around me. Q. Did he kiss you? A. Yes, sir. Q. Well, what else did he do then, Etta? Just tell the jury what else he did then. The Court: Just go ahead and tell about it. A. Well, he told me to slip down to the edge of the seat. Q. Well, what did he do then? A. He got up and got down in front of me. Q. Did he get on his knees? A. Yes, sir. Q. And at this time were you sitting in the buggy? A. Yes, sir. Q. On the seat? A. Yes, sir. Q. Did you slip down to the edge of the seat? A. Yes, sir. Q. Then what did he do with reference to your clothes? A. Well, he pulled my clothes up. Q. Well, what did he do then, Etta? Just tell the jury what he did then. A. Well, he had intercourse with me. Q. Was it painful to you, Etta? A. Yes, sir. Mr. Taylor: That is leading; we object to it. (No ruling.) Q. Was that the first time that he had had intercourse with you, Etta? A. Yes, sir. Q. Had you had intercourse with anybody before that? A. No, sir. Q. Have you had intercourse with him since? A. Yes, sir. Q. Now, you say that this was at your father's home in a buggy? A. Yes, sir. Q. How long did you stay in the buggy after he had had intercourse with you? A. We stayed in there a good while— an hour, I guess, after that. Q. Did you tell your father about this right at the time? A. No, sir. Q. When did you tell him about it? A. I told him about it— Mr. Taylor: That is objected to. (Overruled. Exception.) Q. When did you tell him about it, Etta? A. It was in September that I told him. Q. What caused you to tell him then? A. Well, I thought I would have to tell it some time, and that I may as well tell it at one time as another. Q. Why did you think you would have to tell it some time? A. Well, I knowed they would find it out. Q. How? A. I don't know. The Court: Do you mean that you were pregnant with child? A. Yes, sir. The Court: Are you pregnant now, Etta? A. Yes, sir. Q. Now, when was the next time that Mr. Hast had intercourse with you? A. It was in June after that. Q. When was the next time? A. It was along the first of June, the 9th I think it was. Q. Where was it? A. It was at his storehouse in McLoud. Q. Was it downstairs or upstairs? A. Upstairs. Q. How come you to go up there, Etta? A. Why he told me to come up there. I went to get a sewing machine

5 Cr—12

from him, and he says, 'All right, come upstairs.' Q. Now, at this second time, were you laying down or standing up? A. Standing up. Q. How long have you been pregnant, Etta? A. Well, it will soon be seven months. Q. You are seven months gone in the family way? A. Yes, sir. Q. Etta, before this time, was your character good? A. Yes, sir. (Objected to as incompetent. Sustained.) Q. Etta, when did you say your mother died? (Objected to as a repetition.) The Court: She answered that. Q. Well, I am just coming to another subject. Witness: It was the 7th of July, 1903. Q. Where did you go after she died, if any place? A. Why, I went over to my aunt's— (Objected to as incompetent, irrelevant, and immaterial.) Q. Who went with you? A. Mr. Hast and my sister, Laura. Q. Did he drive you over there? A. Yes, sir. Q. Did he drive you back? A. Yes, sir. Q. Who else was with you besides Mr. Hast, your sister? A. Laura was with me; yes, sir. Q. State what Mr. Hast did coming on the way back from your aunt's to your home? A. Why he kissed me, was all he done. Q. Who did the driving, Etta? A. Laura. Q. What did he say with reference to your going to be married at that time? Mr. Taylor: Objected to as incompetent and leading. (Overruled. Exception.) Why, he made Laura mad because he kissed me, and she was going to tell papa, and he told her that it didn't make any difference, that we was engaged. Q. Now, in what county and territory, Etta, did Mr. Hast have intercourse with you? A. In Pottawatomie county and the territory of Oklahoma. The Court: Had intercourse with you after that? A. Yes, sir. Q. Etta, who is the father of that child that is now in your body? A. Charlie Hast. Q. That is all. Just one other question: Are you married, Etta? A. No, sir. Q. Are you the wife of Charlie Hast? A. No, sir. The Court: Were you his wife at the time you first had intercourse with him? A. No, sir. The Court: Never have been married to anybody? A. No, sir."

E. W. Hindman, a witness for the state, testified as follows:

"Q. Are you acquainted with Etta Hindman? A. Yes, sir. Q. Is she related to you; if so, in what way? A. She is my daughter. Q. How old was she on the 17th of last May? A. The 17th of May, she was 16 years and a half. Q. When was she 17 years old? A. She was 17 the 17th day of last October. Q. Mr. Hindman, are you acquainted with Charlie Hast? A. Yes, sir. Q. Have you had any conversation with him since he was arrested charged with raping your daughter? A. Yes, sir. Q.

Tell the jury when that was? A. Well, it was the next Sunday after he was first turned loose from jail. He came out on Friday, and I seen him at McLoud on Saturday, and he asked me to go down to his store, that he wanted to talk with me, and I told him that I was in a big hurry, and that my daughter, was sick and I could not go, and I went home, and the next morning, bright and early, he came to my house and brought Mr. Carrelton with him. Q. Who is Mr. Carrelton? A. There he is. Q. Where does he live? A. At McLoud, I suppose, he has got an office there. Q. What is his profession? A. He is a lawyer. Q. Was Mr. Carrelton present when you had this conversation there at the house? A. He was present most of the time. Q. In that conversation what did Mr. Hast say to you? A. Well, he told me that he came out there to do what was right about it, and that he was going to make me a proposition, and that he thought a right one; that was, he said he would take my daughter and marry her and treat her as a lady and as his wife and make me and my children all proud of it, I if I would consent to it. Q. What did he say was the cause of the lawyer being there with him, if anything? A. He never said at all; he never said what was the cause of his bringing him along there. Q. Well, what did he say with reference to the fact that if you could agree Mr. Carrelton could draw up the papers? Mr. Carrelton: Objected to as leading and suggestive. (Overruled. Defendants excepts.) Q. Just tell the jury what he said about the lawyer being present, if anything. A. Well, he said that he had Mr. Carrelton, his lawyer, with him, and he would have to pay him for running the case for him, and that he had brought him out there with him to see if we could not come to some agreement, and get the thing settled up right without going to law about it. Q. That is since he has been arrested on this charge? A. Yes, sir; that was on the day week after he was arrested. Q. Is your wife living or dead? A. No, sir; she is dead. Q. When did she die? A. She died the 6th of July last, along about midnight, in the night. Q. On this trip that Mr. Hast made out there, what did he say, if anything, with reference to a thousand dollars? A. Why, I told him that I would not give up to him marrying her under any consideration— (Objected to as incompetent. Overruled. Exception.) I told him that I would not give up under any consideration at all whatever, and he said then, 'Well,' he says, 'if you won't give up,' he says 'I can take this thousand dollars and pay it to the lawyers, but' he says, 'I would

rather give it to you and your daughter'— Etta, he called her— 'than to give it to the lawyers.' Mr. Freeling: I believe that is all."

Laura Hindman, a witness for the state, testified as follows:

"A. We went over to the Kickapoo, four miles northwest of Mc-Loud, to my aunt's. Q. Who went with you? A. Etta and Mr. Hast. Q. How long did you stop over there? 'A. We stayed over there all night and all day the next ·day, and went home that night. Q. Who drove? A. I drove—I drove coming back. Q. Where were you sitting in the buggy? A. I was sitting in the middle. Q. Who was in the buggy with you? A. Well, me and Etta and Mr. Hast. Q. Whose team were you driving? A. I don't know whose it was. He had it rented, I think. I don't know whose it was. Q. State what you saw Mr. Hast and your sister do, if anything, coming back? A. I seen him put his arm sort of round her shoulder, and I told him to take his hand down, and he said it wasn't any use; they were engaged. Q. Did you see him kiss her? A. Yes, sir. Q. And when was that? A. That night when we was coming from Aunt Margaret's. Q. What month was that? A. It was in July. Q. Is that Etta Hindman here your sister? A. Yes, sir. Mr. Freeling: I believe that is all."

Appellant took the witness stand in his own behalf and admitted that after he was arrested he did go to the father of the prosecuting witness and offer to marry her, and that his offer of marriage was declined. He denies that he seduced the prosecuting witness, but admits that he knew she was pregnant with child at the time he offered to marry her. It is inconceivable that an innocent and intelligent man would voluntarily offer to marry a woman, when he knew that she was pregnant with child by some unknown man, for the purpose of preventing a trial which would give him an opportunity to vindicate his innocence. An innocent man with the least spark of manhood and honor would have demanded, and not have sought to avoid, a trial.

The defendant introduced a number of witnesses who testified to acts tending to prove a want of chastity and virtue on the part of the prosecuting witness. The jury saw all of these witnesses

and heard their testimony and was in a much better position to determine as to who was telling the truth than we are.

No exceptions were taken to the instructions of the court, and indeed none could have been, for they are an admirable exposition of the law of the case. The only error in the instructions is that they seem to indicate that the jury must find that the prosecuting witness had been corroborated. This is not necessary. See *Reeves v. Territory*, 2 Okla. Cr. 351, 101 Pac. 1039.

The offense of which the defendant has been convicted is the blackest in the catalogue of crimes. It is a much graver crime than that of rape by force. A rape fiend is generally carried away by the sudden irresistible impulse of the strongest passion to which man is heir. As soon as the crime is committed, he may deeply regret it. It is true that he has committed a fearful outrage upon the body of his victim; but her soul remains pure, and she may still be a loving mother, a trusted wife, and an honored member of society. None of these things can exist in a case of seduction. The seducer acts with the utmost deliberation. He coolly lays siege to the citadell of his victim's heart, and, by all manner of flattery, promises, and protestations of love, he gains her affections and subjects her will to his. This is not the work of a moment, but it extends over days and weeks and maybe months of time. The appellant was over 20 years the senior of this unsuspecting country girl. He was a man of experience and property. She was a mere child. There was no blacker and more deadly treachery in the heart of Judas Iscariot when he betrayed the Savior of mankind with a kiss, than there is in the heart of the seducer, when in the sacred name of love he violates the body and crushes the soul of his unfortunate and trusting victim, merely to gratify his base animal passion. She is as powerless in his hands as a sparrow in the talons of a hawk; as a lamb in the bloody jaws of a wolf. He not only outrages her body, but he——

"Ne'er can give her back again
That which he has taken away,
The brightest jewel woman wears
Throughout her little day.
The brightest and the only one
Which from the cluster riven
Shuts out forever woman's heart
From all its hopes of heaven."

No punishment can be too great for the seducer. Under the Mosaic law, the penalty of death was inflicted for this offense. The seducer was taken beyond the gates of the city and stoned to death. If this was the law now, there would not be so much impurity in our country. Which is worse, to kill the body and let the soul live, or to kill the soul and let the body live? One is physical death, the other spiritual assassination. The courts and juries of this state cannot be too vigilant in protecting the innocent girls of our country against the wiles and machinations of such incarnate fiends in human form. The virtue of our girls is the most sacred thing this side of Heaven. The man who boasts that he can take a thousand dollars and beat a prosecution for seduction as appellant did had better leave this state if he desires to preserve his liberty. Of course, no one should be convicted upon suspicion; but where a defendant has been found guilty of this infamous and detestable offense, after having had a fair and impartial trial, and the evidence clearly shows his guilt—as it does in this case— it would be a crime against society and treason to virtue to set the verdict aside.

The Reporter will insert the instructions of the court to the jury just after the statement of the case.

The judgment of the lower court is amended and reformed so as to provide for the confinement of the appellant in the penitentiary of Oklahoma, situated at McAlester, for the period of six years from the date of his reception therein, and said judgment is in all things affirmed.

ARMSTRONG and DOYLE, JUDGES, concur.