## STERLING CLUCK v. STATE.

No. A-1424.   Opinion Filed June 11, 1913.

(132 Pac. 930.)

1. **SEDUCTION—Evidence—Corroboration—Necessity.** In a prosecution for seduction under promise of marriage, the testimony of the prosecutrix must be corroborated as to the promise of marriage and the illicit intercourse, but need not be as to her being unmarried and of previous chaste character.

2. **SAME—Sufficiency of Evidence.** For testimony held to be sufficient to sustain a conviction for seduction under promise of marriage, see opinion.

(Syllabus by the Court.)

*Appeal from District Court, Le Flore County;*
*Malcolm E. Rosser, Judge.*

Sterling Cluck was found guilty in the district court of Le Flore county of the crime of seduction, and his punishment was assessed at confinement in the penitentiary at McAlester for 18 months, and he appeals. Affirmed.

Lola Ball testified that she was 18 years of age and lived at Cowlington; that she had known appellant for about four years; that her mother was dead; that her mother died when she was seven years of age; that appellant had been going with witness 2½ years; that a year after appellant began going with witness they became engaged to be married; that when appellant first asked witness to marry him she declined to do so, upon the ground that she was too young, but that she would marry him as soon as she got old enough; that appellant frequently called at witness' house to see her, and frequently took her to church and singing; that the father of witness objected to her going with appellant; that appellant frequently met witness at her aunt's house, and had seen her at singing and church and at parties; that after appellant had been engaged

to witness for some time he asked her to have intercourse with him; that witness declined. Witness then testified as follows:

"He asked me why, and I said it was wrong. He said that there was no harm in it, and I said that there was. I said he would not think as much of me if I did, and he said, 'Yes;' he would think three times as much of me if I did. He said that other girls did that, and I said I did not care; I did not want to do that way. The Court: Go on. A. He said that I was going to be his wife, and I told him that I did not want to do that way. He kept on begging, and said: 'I'll do the right thing; I'll hold up my right hand and swear that I'll marry you.' Q. Did he swear it? A. Yes, sir; he knelt down on his knees and swore it. Q. Then you consented? A. Yes, sir. Q. Where were you when he had intercourse with you? A. I was lying down on the carpet. Q. Did you lay down yourself? A. No, sir; he laid me down. Q. Who unfastened your clothes, Lola? A. He did. Q. Did he hurt you or not? A. Yes, sir; he did. Q. Did you tell him that he was hurting you? A. Yes, sir. Q. Did he have intercourse with you after that? A. Yes. Q. How long after? A. It was a night or two. Q. What did he say to you about it then? A. He said for me to do like other men's wives, and I said I did not want to, and he said that other girls did that way. Q. Did he tell you that the second time? A. Yes; he told me that every time. Q. Was anything said about marrying these other times? A. Yes, sir; he gave me his hand each time and said that we would marry. Q. What did he do? A. He gave me his right hand and knelt down on the floor. Q. You say he would give you his right hand and kneel down on the floor? A. Yes, sir. Q. Is that right? A. Yes; he would give me his right hand and swear that we would marry. Q. What was it he would say when he would swear? A. He said, 'I'll swear before God that we will marry.' Q. Would he do that every time he had intercourse with you? Defendant: We object to leading the witness in this manner; we do not think it is fair to the defendant. The Court: She has already stated that; but, it is not proper to repeat what the witness has stated, and it is a waste of time. Q. How many times did he have intercourse with you? A. Four times. Q. Four times? A. Yes, sir. Q. Were there, or not, any results from these acts of intercourse? A. Yes, sir. Q. Anything that followed it? A. Yes, sir. Q.

What was it? A. I don't know what it was. Defendant: We object. Q. Was there a child born? A. Yes, sir. Defendant: We object. The Court: I think it is competent for her to show whether she became pregnant, and that a child was born. Defendant: We except. Q. When was the last time he had intercourse with you? A. On Wednesday night before he married Thursday. Q. Was anything said about marriage at that time? A. Yes, sir; he gave me his hand and swore that he would marry me."

She also testified that she had never had sexual intercourse with any other person than the defendant.

James Ball testified that he was the father of Lola Ball; that her mother died in 1902; that the appellant frequently waited on his daughter; that appellant was with his daughter so often that witness requested him to quit keeping company with her; that during the last week of December, 1910, Lola Ball gave birth to a child.

Mrs. Martha Ball testified that she was the stepmother of Lola Ball; that in the latter part of December, 1910, Lola Ball gave birth to a child; that appellant had been going with Lola Ball for about two years before this.

Mrs. Mary Ball testified that she was a sister-in-law of Lola Ball; that she was acquainted with appellant; that appellant kept company with Lola Ball; witness once heard appellant call Lola Ball his freckled-faced wife.

Mrs. J. F. Bridges testified that she was acquainted with Lola Ball, and was also acquainted with appellant; that appellant frequently came to her house for the purpose of meeting Lola Ball; that they acted just like young people sparking.

West Sumner testified that Lola Ball was a niece of his wife; that he was acquainted with appellant; that appellant visited Lola Ball at the house of witness; he heard appellant talking about marrying Lola Ball, and in this conversation appellant said he would have her if it took him 10 years to get her.

Mrs. J. F. Husband testified that she was acquainted with appellant and also Lola Ball; appellant once came to the house of witness and wanted her to make some clothes for Lola Ball;

witness had heard appellant say he would not deny that he had been engaged to Lola Ball.

Mrs. Maud Person testified that appellant had been visiting Lola Ball about two years; that at the request of appellant witness had made a waist; that before making the waist she took the measurement of Lola Ball to make it by.

Appellant introduced his wife, Mrs. Gertie Cluck. She did not testify to any material facts or offer any further evidence.

*Tom W. Neal,* for appellant.
*Smith C. Matson,* Asst. Atty. Gen., for the State.

FURMAN, J. First. The testimony in this case is clear and conclusive as to the guilt of appellant. Lola Ball testified that she had never had sexual intercourse with any other person than appellant. She gives a detailed account of the manner in which her seduction was accomplished by appellant, all of which is corroborated by the circumstances of the case. Appellant did not take the witness stand, and offered no testimony in his behalf which threw any light upon the material questions in the case.

Section 6838, Comp. Laws 1909, Rev. Laws, 5886, is as follows:

"Upon a trial for inveigling, enticing or taking away an unmarried female of previous chaste character, under the age of twenty-five years for the purpose of prostitution, or aiding or assisting therein, or for having, under promise of marriage, seduced and had illicit connection with an unmarried female of previous chaste character, the defendant cannot be convicted upon the testimony of the person injured unless she is corroborated by other evidence tending to connect the defendant with the commission of the offense."

Under this statute the testimony of the prosecutrix must be corroborated as to the promise of marriage and illicit intercourse, but not as to her being unmarried and of previous chaste character. That Lola Ball was a country girl of previous chaste character is proven by her testimony; for she testified

that she had never had sexual intercourse with any person except appellant, and this was not called in question by any evidence on behalf of appellant. That appellant had been her accepted beau since she was 15 years of age is also proven. To one witness appellant once referred to her as his freckled-faced wife. In talking to another witness with reference to his engagement to her, he said that he was going to have her if it took him 10 years to get her. To another witness appellant stated that he would not deny that they had been engaged to be married. These statements of appellant corroborate the testimony of Lola Ball as to the promise of marriage. The facts that appellant was constantly with Lola Ball and was her accepted beau, and the birth of her child, corroborate her statements as to her seduction by appellant. This is all the corroboration which is needed, or that the law requires.

In the case of *Harvey v. Territory,* 11 Okla. 157, 65 Pac. 838, Judge Burford, in considering this question, said:

"It is contended by plaintiff in error that this statute requires corroboration of the prosecutrix on every element of the offense. We cannot agree with this contention. The authorities seem to be in irreconcilable conflict on this question, but such conflict is more apparent than real. Almost every state has a statute requiring some kind of corroboration in this class of cases, yet these statutes very materially vary in their provisions and requirements. It is by reason of this difference in the various statutory provisions that the seeming conflict in the decisions of the courts arise. We must first determine the meaning and purpose of our own statute. The only requirement is that the prosecutrix must be 'corroborated by other evidence tending to connect the defendant with commission of the offense.' Now, there are but two things that he is charged with doing, viz., promising to marry the prosecutrix, and having illicit connection with her. The other two elements of the offense go to the character of the person protected by the law, viz., an unmarried female, and the one of chaste character. With these two elements the defendant is in no way connected; no action of his brings about either condition; but if he has promised to marry her, then he is connected with this element of the crime, and her evidence alone is not sufficient to establish such promise;

and if he has had illicit intercourse with her this act also connects him with the offense, and the evidence of the female with whom the intercourse was had is not sufficient to prove such fact. Hence we think the purpose of the statute is to require the prosecutrix to be corroborated on the promise of marriage and the illicit intercourse, and not upon the elements that go alone to her characteristics, viz., that she was unmarried, and that she was of chaste character."

An examination of the case of *Harvey v. Territory, supra,* in which the conviction of appellant was affirmed, will show that the case at bar is much the more flagrant of the two, and is supported by a much greater weight of evidence.

In the case of *State v. Smith,* 84 Iowa, 522, 51 N. W. 24, the Supreme Court of that state held that in a prosecution for seduction the fact that the parties kept company and acted as lovers usually do, and other like circumstances, are sufficient corroboration of the evidence of the prosecutrix.

The evidence in the case at bar makes out a most inexcusable, long planned, cunningly devised seduction planned by appellant, and there is not one word of testimony in the record which raises the suspicion that he is not guilty as charged.

We desire, in this connection, to repeat what we said in the case of *Hast v. Territory,* 5 Okla. Cr. 162, 114 Pac. 261, as to the enormity of the crime of seduction:

"The offense of which the defendant has been convicted is the blackest in the catalogue of crimes. It is a much graver crime than that of rape by force. A rape fiend is generally carried away by the sudden irresistible impulse of the strongest passion to which man is heir. As soon as the crime is committed, he may deeply regret it. It is true that he has committed a fearful outrage upon the body of his victim; but her soul remains pure, and she may still be a loving mother, a trusted wife, and an honored member of society. None of these things can exist in a case of seduction. The seducer acts with the utmost deliberation. He coolly lays siege to the citadel of his victim's heart, and, by all manner of flattery, promises, and protestations of love, he gains her affections and subjects her will to his. This is not the work of a moment, but it extends over days and weeks and maybe months of time. The

appellant was over 20 years the senior of this unsuspecting country girl. He was a man of experience and property. She was a mere child. There was no blacker and more deadly treachery in the heart of Judas Iscariot when he betrayed the Savior of mankind with a kiss than there is in the heart of the seducer, when in the sacred name of love he violates the body and crushes the soul of his unfortunate and trusting victim, merely to gratify his base animal passion. She is as powerless in his hands as a sparrow in the talons of a hawk; as a lamb in the bloody jaws of a wolf. He not only outrages her body, but he —

> " 'Ne'er can give her back again
> That which he has taken away,
> The brightest jewel woman wears
> Throughout her little day.
> The brightest and the only one
> Which from the cluster riven
> Shuts out forever woman's heart.
> From all its hopes of heaven.'

"No punishment can be too great for the seducer. Under the Mosaic law, the penalty of death was inflicted for this offense. The seducer was taken beyond the gates of the city and stoned to death. If this was the law now, there would not be so much impurity in our country. Which is worse, to kill the body and let the soul live, or to kill the soul and let the body live? One is physical death; the other spiritual assassination. The courts and juries of this state cannot be too vigilant in protecting the innocent girls of our country against the wiles and machinations of such incarnate fiends in human form. The virtue of our girls is the most sacred thing this side of heaven. The man who boasts that he can take $1,000 and beat a prosecution for seduction, as appellant did, had better leave this state if he desires to preserve his liberty. Of course, no one should be convicted upon suspicion; but where a defendant has been found guilty of this infamous and detestible offense, after having had a fair and impartial trial, and the evidence clearly shows his guilt, as it does in this case, it would be a crime against society and treason to virtue to set the verdict aside."

The legal propositions presented in the oral argument and brief of counsel for appellant have all been repeatedly de-

cided adversely to the contentions therein made by this court. It is therefore not necessary to repeat them.

The conviction of appellant is just and merited. We find no material error in the record. The judgment of the lower court is therefore in all things affirmed.

The imprisonment of appellant will begin on the day of his reception in the penitentiary. Mandate will issue without delay.

ARMSTRONG, P. J., and DOYLE, J., concur.