## Q. D. DENHAM v. STATE.

No. A-2925—Opinion Filed Aug. 26, 1919.

Rehearing Denied May 29, 1920.

(192 Pac. 241.)

(Syllabus.)

1. **APPEAL AND ERROR—Discretion of Lower Court—Overruling Challenge for Cause.** When the defendant has exhausted his peremptory challenges of jurors, the overruling of a challenge of a juror for cause is not a reversible error, unless it be made to appear that in so ruling the court abused its discretion.

2. **JURY—Number of Peremptory Challenges—Compliance With Statute.** The number of peremptory challenges allowed a defendant being fixed by statute, a trial court is without authority to increase the number of such peremptory challenges.

3.    **SEDUCTION—Consent by Promise of Marriage and Fears.**
      Sexual intercourse with an unmarried female within the age
      of consent, to which her consent is secured by a promise of
      marriage, constitutes seduction, although her consent was also
      secured by arousing her fears.

4.    **SEDUCTION—Voluntary Intercourse not Rape.** Where sexual
      intercourse is voluntarily had by an unmarried female within
      the age of consent, a prosecution for rape cannot be maintained.

5.    **SEDUCTION—Evidence—Sufficiency.** The record in this case
      carefully examined, and the evidence found sufficient to sus-
      tain the conviction, and the trial free from fundamental error.

*Appeal from District Court, Garvin County;*
*F. B. Swank, Judge.*

Q. D. Denham was convicted of seduction, his motion
for a new trial was overruled, and he appeals.   Affirmed.

*Thompson, Patterson & Farmer,* for plaintiff in error.

*S. P. Freeling,* Atty. Gen., and *C. W. King,* Asst. Atty.
Gen., for the State.

ARMSTRONG, J.   The plaintiff in error, Q. D. Den-
ham, hereinafter called defendant, was prosecuted by in-
dictment for the seduction of Lela Henson, an unmarried
female of previous chaste character, convicted, and sen-
tenced to imprisonment in the penitentiary at McAlester
for 2½ years.   To reverse the judgment rendered he
prosecutes this appeal.

The defendant having exhausted his peremptory chal-
lenges and there being only eleven jurors selected, the
county clerk drew from the box containing the names of
the jurors for the week the name of F. C. Haley, who, up-
on being duly sworn, was subjected to a most extensive and
crucial examination on his voir dire.   The material facts
developed by said examination were that the said Haley
was a friend of the father and family of the prosecuting

witness in this case; that five years prior to the time of
his examination they lived near each other; that their fam-
ilies were intimate; that they were members of the same
church and often attended church together; that he was
not related to the said father of the said prosecuting wit-
ness or his family; that he had no reason to believe that
the relations of the father of the prosecuting witness and
his family were then different from those existing when
they resided near each other; that he preferred not to sit on
the trial on account of his relation with said family; that
he had never heard of the defendant until this case was
filed; that he had heard of the case, but that he did not
know anything about the merits of it; that he had formed
no opinion as to the guilt of the defendant; that he thought
he could and would give the defendant a fair trial; that
he would be governed by the evidence and the law as in-
structed by the court; that if the evidence showed that the
prosecuting witness had had intercourse with the defend-
ant, and if instructed by the court that such evidence en-
titled the defendant to have a verdict of not guilty returned,
he would follow such instructions and vote to acquit the
defendant; that if selected as a juror he would be governed
by the evidence and the law as instructed by the court.

The defendant challenged the said F. C. Haley for
cause, the court overruled said challenge, and the defend-
ant excepted. Thereupon defendant moved the court to
permit him to extend his peremptory challenges to the
juror F. C. Haley; the court having overruled his challenge
of said juror for cause. The court overruled the motion
and the defendant excepted.

The undenied evidence is that the defendant was a
school teacher and taught school in the neighborhood in

which Lela Henson, the prosecuting witness, lived with her father's family; that they became acquainted; that at that time she was about 18 years old; that he paid her court and visited her often; that the full hospitality of the home of her father was enjoyed by him, he often going to said home on Saturday evening and remaining until the following Sunday evening; that he professed great attachment for her; that they corresponded continuously; that he wrote her many letters, 39 of which were in evidence. The tone of said letters are uniform, and two of them read as follows, viz.:

"Wed. p. m.

"Dearest One: 'Grape nuts,' I have been farming and you should have seen me. I am certainly a typical sight and just simply think its fun. I plowed for Mr. Dodds this afternoon after school until night. I want a long talk with you right away when I can see you. Real soon I hope. These old days are long, believe me. We have supper every night about nine and breakfast about 5:30. You know it is working on my constitution.

"Did you go to town to-day? Who went with you? I have been wondering all day if you did. Wish I knew.

"I got a card from Maysville to-day inquiring about my eye. Will let you see it some time. Had a letter from Mother, wanted to know if I was going to start on Saturday after my school on Friday. What must I tell her? Yes or no? Don't want to leave you at all and at this moment don't feel like I can. 'Cause I know you love me, and will always. Won't you dear? You know I worship you, and some other people know too. I have heard Mr. and Mrs. D—— talking Sunday evening after you left, and they said I certainly stayed with you & was good to you, and I will be always too. Somehow I dread to make my trip this summer and the more I study about it, the more dread

that I have. Sweetheart I know that I love you and dread to leave you as much as I can, and don't seem like I can leave you, and some other dread somewhere and I don't know it.

"Listen, one thing I want to talk to you about is, that us going back there to live and I am anxious to see you so I can do further about it.

"With love."

"4:00 p. m.

"Dearest: I come in from school and laid down reading the paper, went to sleep and dreamed that I was trying to get you to tell me something and you would not do it, and when I awoke I got mad and got up and went to work to keep from studying about it, I wish I could see you. Could just love you to death, 'cause you are simply a 'deah' anyway.

"I have something to tell you soon. Oh, my, I never would get tired talking to you, cause I love you so much. It has been a month, seemingly, since I have seen you. Sure enough it doesn't seem that only yesterday I was with you. Sure does seem longer than that.

"I am so jealous, is one thing that makes time seem so long when I am away from you. Sweetheart be a true lover to me, cause I do worship you, and hope your actions will prove the same.

"I will write you some more to-morrow as I generally do. With all love that human can give, I give to you. I must go to supper. Ever and ever, ever and ever

"Yours,                                    Derwood."

"My dearie: After reading your letter, I am so blue I know not what to do. Seemingly sometimes life is nothing but troubles and misfortunes, but there is one thing that is dearer than all, even if we do have troubles and

that something is new to me. The love that I have known for such short time and so much pleasure there is with it, and yet some one (I suppose that has been in the lone channel) is trying to separate us when they have no realization what we do mean to each other. Lela, I am simply proud of you and love you better than ever, and hope that these people will not impress you in any way to make you cease to love me, because I have come to realize lately that life would be one pleasant dream with the one I love dearer than life and with the one that is willing to share all with me. Pleasures, sorrows, misfortunes and all, and I think you are the noblest person I know, and with you I shall be true.

"Sweetheart, it is funny to me why they take such pains to separate us, when they know that my life, and I truly hope yours too, would be at the stake for misery to pluck its fierce fangs thru and wreck and ruin forever. Why they want to separate us is the question to me. I surely hate to pesturate any one, but Lela, I love you and like you. I will stand by you thru all and all. O, if I just could see you and talk with you, maybe you could drive away this cloud of blues and fears. I believe that you are everything that is good and noble, Lela, I do, and you can judge whether you think best of us being together like we have been or not. And sweetheart, you are so noble and good, I must see you before long. Am awfully busy this week filling out reports & etc.

"I hope we can be together soon 'cause I will be blue now until we do. Where we can have a face to face talk, but write what you have to tell me.

"In a way I just simply feel as though I was an outcast, not yours, but some one that is near and dear to you. I feel like nobody, for the first time in my life, but your life that is in me, is still living and shall live as long as you are true and noble as you have been since our courtship. You judge the way you think best, and surely you won't judge wrong.

"With all my love and strength, I am yours to life's end.                                                   Derwood."

That defendant addressed the prosecuting witness and they became engaged to be married, and the defendant in her presence sought and obtained the consent of her father and mother to their marriage; that on Sunday, May 10, 1915, while the defendant was visiting at the home of the prosecuting witness, she and the defendant walked out and went to the home of her brother, which was about 200 steps from her father's home; that the doors of the said home were open and they went in for the defendant to get some water, at which time no one was in the house other than themselves, and the defendant asked her to sit down on a couch in the front room and she did so; that he sat down with her and he put his hand under her dress, to which she objected and got up, and he pulled her down on the couch and told her it was all right as they were to be married, that all persons who were engaged did it, and he intended to do it too, and stated that he could show her some passages in the Bible which said that there was no harm in it; that she was crying and moved up to the end of the couch, and that she consented under his promise of marriage, though she was frightened, and he pulled her down on the couch and had sexual intercourse with her, the particulars of which we deem unnecessary to recite; that she became impregnated by him; that she advised him of her condition, and that he requested her to go to Oklahoma City and be relieved, which she declined to do; and thereafter her father and mother having become advised of her condition, they and herself saw the defendant in Maysville, and her father demanded of the defendant that he marry her as he had promised, which he made excuses not to do,

and got away from them under the pretext of having to attend a school meeting and the promise to see them again and give them a definite answer, hired a car, and left at once for Chickasha, and upon phone request was arrested and brought back; that as a result of the sexual intercourse with the defendant she had given birth to the child which she exhibited in court; and that the said defendant was the father of her child.

The evidence was in conflict as to whether or not the prosecuting witness was of chaste character prior to her first act of sexual intercourse with the defendant; she testifying that she had never had sexual intercourse with any man other than the defendant prior to or since said act of sexual intercourse which she had with the defendant in the home of her brother.

Texas Willis, a witness for the defendant, testified that in 1910 or 1911, when he was going to school, one night when prosecuting witness was going home from a picture show he met her near the express office; that he would not say whether she was by herself or not; and that they went over in the north part of town and on the sidewalk north of the depot he had sexual intercourse with the prosecuting witness; that he would not say for sure whether there were electric lights where it happened, and after it happened he took her home; that she was a little girl at the time; that he had done it to her several times, but could not remember when or where, or anything like that; that he did not remember when he did it to her upon the occasion when he met her coming from the picture show, whether that was the first occasion or not; that he could not think of anybody he had told about it; that he had not the least idea how the defendant found it out;

that he lived in Pauls Valley until 1914, and now lived in Texas; that he had not been promised or paid by any one to come here and testify; and that the prosecuting witness had sexual intercourse with him without previous engagement, and without consideration to her; and that he called at her house in 1910 or 1911.

Perry Rice testified that in 1911 he was 18 years old; that he formerly lived in Pauls Valley and now resided in Enid; that he was not sure whether or not the prosecuting witness was going to school then; that in the fall of 1911 he had sexual intercourse with her; that he was never a sweetheart of hers; that the relations between them began in the spring of 1911; that he did not know whether at that time she wore short dresses or not; that he did not know her father or mother; that he did not know whether or not she was attending school at the time; that he had intercourse with her the first time he asked her in the fore part of the evening; that with Pearl Cromer, Fletcher Johnson, Texas Willis, Ralph Dorchester, Lela Henson, and her sister and the Wetzall girl he went to Kerr's race track, and they were all in the alfalfa field together; that he and the prosecuting witness went off to themselves; that he did not know whether he requested her or not for anything; that he did not know whether he said a word or not; that he did not remember whether she lay down voluntarily or not; that he could not remember details; that he had sexual intercourse with her in the alfalfa field; that it did not cost him anything; that he satisfied himself just one time; that he had also had intercourse with her some time that spring on the "Lindsay Y"; that he went up to the Christian Church and looked in the window and saw her, and that afterwards they got together and had sexual intercourse; that he did not remember telling of having intercourse with her

to any one until he told it at the last term of court; that he was out rabbit hunting with her and another couple down on the river bank; that he did not know what he said to her, or if she answered; that he then had sexual intercourse with her on the river bank; that he did not know whether or not it was under a tree; that it was not in the weeds; that he did not think he had intercourse with her except the three times named; and that before he was subpœnaed he did not know what he was subpœnaed for.

Guy Carter, a witness for the defendant, testified that he was 23 years old; that he had resided in Pauls Valley 16 years; that he knew Lela Henson, the prosecuting witness, in 1911, and that during that time he had seen Lela Henson and Bill Perry together; that he saw them one night at a skating rink when Bill Perry accompanied her home; that they went down Grant Avenue on the east side of the town, rather out to the far end of the road; that they went out into an alfalfa patch which had a barbed wire fence around it; that they went through the fence; that the wire was loose and they went under it; that there was a few weeds growing along the inside of the fence; that they never went far; that they stayed there about 15 minutes, got up, and went back to Mr. Henson's; that he went in front of them and saw them go to the house; that it was about 9:30 or 10:00 o'clock at night; that it was not so light; that it was kind of cloudy.

Several witnesses were introduced by the defendant who each testified that they knew the defendant; that his general character and reputation before this prosecution was good, and that of a law-abiding citizen, which was not combated by the state.

The defendant did not testify in his own behalf.

In rebuttal, Mrs. Pearl Sropson, nee Cromer, testified that she was a daughter of Rev. D. F. Cromer; that she knew the prosecuting witness, Perry Rice, Fletcher Johnson, Texas Willis, and Ralph Dorchester; that she never, in company with these four boys and Miss Lela Henson and her sister and a Wetzall girl, made a trip during the year of 1911, or at any other time, to Kerr's Park; and that she was never at any time out with them.

Miss Lela Henson, the prosecuting witness, testified, in rebuttal, that she knew Texas Willis; that she did not along in 1911, or at any other time, go from a picture show on her way home and meet Texas Willis near the express office and go with him to the northern part of town; that Texas Willis never at any time or place had had sexual intercourse with her; that he never came to see her; that he brought her from church one night, and then he accompanied her from church once or twice, and she left him because he attempted to insult her; that he afterwards called her up on the phone, and upon her declining to go with him said to her, "Damn you, go to Hell;" that on account thereof her brother and Texas Willis had a fight that night; that she knew Perry Rice and had known him since he had been in Pauls Valley; that they never went to school together; that in 1911 she was 15 years old; that she never in company with Pearl Cromer, her sister, and the Wetzall girl, Fletcher Johnson, Ralph Dorchester, Perry Rice, and Texas Willis, during 1911, or at any other time, went down to Kerr's race track; that she was never down there with Perry Rice; that she was never at the Y with him; that she never went rabbit hunting on the river with Perry Rice, her sister, and others; that Perry Rice

never had had intercourse with her; that she knew Texas Willis; that she had never, when going home from down town, met and gone out to an alfalfa patch and sat down in the nighttime with Perry Rice; that Perry Rice had never at any time met her in the Christian church and gone with her anywhere; that she was never at the Christian Church; that she attended the Baptist Church.

The defendant requested the court to give the jury the following instructions, which the court refused to do, and the defendant excepted:

"No. 3. If you find from the evidence that the prosecuting witness submitted to the sexual embraces of the defendant through fear or bodily harm, occasioned by threats of defendant, he would not be guilty of the offense charged herein, and you will acquit him."

The defendant timely moved for a new trial, which the court overruled, and the defendant excepted.

The defendant earnestly insists that the court committed reversible error in overruling his challenge for cause to the juror F. C. Haley, who served upon the jury, he having exhausted his peremptory challenges, and in refusing to permit him to extend his peremptory challenges to said juror.

While we do not approve the manner in which this juror was examined and re-examined, and the repeated and elaborate explanations of the law by the court, we are unable, after a careful consideration of the entire examination of said juror and the explanations of the law by the court, to see that the court, in overruling said challenge of said juror for cause, abused its discretion, and in so doing invaded any constitutional or statutory right of the defendant.

The statute fixes the number of peremptory challenges to which the defendant was entitled, and the court was without authority to increase the number thereof: and therefore the contention of the defendant that the court committed reversible error "in refusing to permit him to extend his peremptory challenges to said juror" is without the slightest merit. The court can interpret but cannot enact laws. Legislating is alone within the province of another branch of the government. If the court could legally extend the number of peremptory challenges as requested by defendant, it could do so to an unlimited extent, and thereby repeal the law as to the number of challenges allowed a defendant. The statement of such proposition shows that the contention of the defendant that the court erred in refusing to extend the number of peremptory challenges fixed by law is not worthy of the slightest consideration.

That Haley was a fair and impartial juror, we think, is conclusively shown by the punishment awarded in this case; a punishment much less than we think should have been inflicted under the evidence in this case.

The defendant also complains that the court committed reversible error in refusing to give his requested instruction No. 3. The court instructed the jury in its general instructions that in order to convict the defendant they must find beyond a reasonable doubt that defendant accomplished such illicit connection at said time under promise of marriage; therefore said instruction necessarily instructed the jury that any other actuating cause than a promise of marriage would not be sufficient to sustain a conviction; and therefore said requested instruction was covered by said general instructions, and the refusal to give said requested instruction was not error.

The defendant further complains that the evidence is insufficient to support the verdict for the reasons that the evidence shows that if the defendant is guilty of any offense he is guilty of rape, and the evidence of Texas Willis and Perry Rice show that the prosecuting witness was not of previous chaste character and for that reason was not subject to seduction, and that the seduction was not accomplished under a promise of marriage. These contentions, we think, are entirely untenable.

When the entire evidence is carefully read, and especially the very affectionate letters written by the defendant to the prosecuting witness, it cannot be questioned that the defendant won her affections and confidence, and when arranging to debauch her impressed her with the good faith as to his intention to marry her, and that her affection for the defendant and his promise of marriage was the actuating cause that prompted her to consent to submit her person to the gratification of his lust. There is no question that she consented to sexual intercourse with the defendant, and consequently there could be no element of rape in said act. While she also says that she was frightened when he sought her undoing, taking her evidence as a whole, and which is not contradicted, it must be concluded that she consented to his sexual embraces on account of his promise to marry her; while on God's holy day, in the home of her brother, and while enjoying the hospitality and confidence of her family, to accomplish the great wrong perpetrated upon her, he impressed her that by reason of the fact that they were engaged to be married it was not wrong for them to have sexual intercourse, saying to her that all engaged persons did it, and he was going to do it too, and that such an act he could show her by Scripture was not wrong.

The first act of criminal intercourse by consent constitutes the crime, and therefore it is unnecessary to consider subsequent acts of illicit intercourse had by the defendant and the, prosecuting witness.

In *People v. Wallace,* 109 Cal. 611, 42 Pac. 159, it is said:

"It is not essential, however, * * * that the evidence should disclose any express or direct reference by the seducer to such promise as a means to accomplish his purpose; nor, on the other hand, that the consent of the female should be expressly rested by her upon such consideration. It is sufficient if the circumstances be such as to warrant the jury in the deduction that the act of sexual intercourse would not have been accomplished without, or in the absence of, such promise."

In the instant case the record discloses a state of facts fully justifying the jury in inferring that, even though the prosecuting witness may have been to some extent influenced by fear of the defendant, the real actuating cause that induced her to submit to his lust was her affection for him and his promise of marriage. It is true that on cross-examination she used some expressions tending to show a want of consent; that she submitted through fear; and from this defendant seeks to draw the inference that her submission was brought about by violence, and that therefore he could only, under the evidence, be guilty of rape; but the only fair and reasonable deduction that can be drawn from her entire testimony is that she yielded her virtue to the defendant, moved thereto by her affection for him, and especially on account of his promise of marriage. *Jones v. State,* 90 Ga. 616, 16 S. E. 380. We decline to follow the authorities cited by the defendant which are in conflict with the views above expressed.

It is further insisted that the evidence of Texas Willis and Perry Rice each shows that at the time the prosecuting witness first had sexual intercourse she was not of previous chaste and virtuous character, as four years previous to the act of the defendant in having intercourse with the prosecuting witness these two boys each had sexual intercourse with her when she was a young school girl; and that therefore this shows that the evidence is insufficient to support the verdict. We think, for reasons hereinafter given, that this contention is without merit.

That the jury are the exclusive judges of all questions of fact, and as to what evidence they will believe, and what reject as unworthy of belief, and that where there is evidence, notwithstanding the evidence is in conflict, to support the verdict, this court is powerless to disturb such verdict, has been so often held by this court as to render the citation of authority in support thereof entirely unnecessary.

The prosecuting witness having testified that she never had had at any time sexual intercourse with any man other than the defendant, if the jury believed this, as they evidently did from their verdict, this justified them in finding, which is necessarily included in their verdict of conviction, that the prosecuting witness was of previous chaste and virtuous character.

The defendant did not testify at the trial and did not offer any real defense, and did not present any exculpatory evidence worthy of credence. The evidence fully establishes his guilt, and the judgment will not be disturbed.

We adopt and approve, as entirely applicable to this case, the conclusion stated by Presiding Judge Doyle in

*Butts v. State*, 12 Okla. Cr. 391, 157 Pac. 704, which reads:

"A careful examination of the record fails to disclose any material errors in the rulings upon the evidence or the instructions of the court. In our opinion the evidence amply supports the verdict. A case seldom appears in criminal annals showing more depravity in the defendant. or a greater outrage to common decency and public morals. It is to be hoped that the effect of this conviction in this case will be to protect other girls, whose untutored wills might be overcome by a seducer's wiles."

The court did not err in overruling the motion for a new trial.

The judgment of the trial court is affirmed.

DOYLE, P. J., and MATSON, J., concur.