## PLEAS HODO v. STATE.

No. A-6376.    Opinion Filed Feb. 9, 1929.
(274 Pac. 688.)

66

G. A. Chappell, for plaintiff in error.

Edwin Dabney, Atty. Gen., for the State.

DAVENPORT, J. The plaintiff in error, hereinafter called the defendant, was convicted in the district court of Kay county for obtaining illicit connection with Veril McMasters under a promise of marriage by the defendant to the said Veril McMasters, which said promise was not fulfilled, the said defendant having failed and refused to marry the said Veril McMasters, and not now being the husband of the said Veril McMasters, and was sentenced to pay a fine of $500. Motion for new trial was filed and overruled, and defendant excepted and appeals to this court.

The testimony on behalf of the state is, in substance, as follows: Veril McMasters stated she was 21 years of age; she had lived in Kay county practically 10 years; that she was a graduate from the Newkirk high school; that her family moved from Missouri to Newkirk; she knew defendant in Missouri before coming to Oklahoma; defendant began keeping company with her in March, 1924; the first time she went out with defendant they went to a schoolhouse to establish a Sunday School; after that time defendant was with her two or three times a week; on the 18th day of May, 1924, she and defendant became engaged to be married; the reason why she remembers the date was it was her birthday; that they were on the road home from Newkirk. "We were talking, and he said, 'Would you answer a serious question if I asked you one?' and I said, 'Yes. if it is necessary;' and he said, 'I want to ask you one if you will give me an answer;' and I said, 'Yes, I will give you an answer;' and he said, 'Will you marry me?' and I said, 'I don't think that is a fair question;' and he said, 'It is fair with me and it ought to be fair with you;' and I said, 'I won't answer it now;' and he said, 'When will you answer it' and I said, 'I will answer it Sunday morning;' and he said, 'Why, Sunday we are going to the 101 Ranch, you will answer it then.' This conversation was on Friday night; we went to the 101 Ranch Sunday, and I answered, 'Yes, that I would marry him;' I had intercourse with the defendant about Wednesday following the 18th of May; I believe we had been to Blackwell to a show; it took place in Kay county, about one mile south of Dilworth, Okla.; we were going along joking about being engaged, and he asked when we would be married, and I told him I did not know. he said, 'I need somebody, and I need them pretty bad;' and I replied, 'Your mother is a good cook;' he said what he wanted was not somebody to cook; he said he wanted somebody to sleep with, and I said, "Maybe you could persuade your father.'

Nothing more was said until about a mile further west, and he turned the car and I told him the road home was the other way, we haven't time to fool around, it is midnight; and he replied, 'I have something serious to talk to you about;' I said, 'All right, let's hear it;' and he did not say anything. he went on a little ways, stopped his car, and sat there a little bit, and said, 'I think you ought to come across;' and I told him I did not know what he meant, and he said, 'You ought to, well, if you don't I will show you pretty soon;' I said, 'Well, I am not going to anyway;' and he said, 'We ought to, that we were engaged, that makes it all right;' and I said it did not make it right with me; he said, 'We are married in the sight of God just the same as if we were married;' finally he got out of the front seat and got in the back seat, and lifted me across the top of the seat into the back seat; he was hugging and kissing me; he pulled me on his lap and had to hold me; and I told him he ought not to do that; and he said it was all right, it was the way he believed, and that it did not make any difference, he was going to be boss; he pulled my dress up, and then he said he was going to show me right now. I cried, and he just went ahead, and I submitted to it, and he had intercourse with me; I submitted because he promised to marry me any way, and I did not think it would make a whole lot of difference; we had intercourse again on Saturday night of that week; we were returning from Newkirk; he repeated about the same words he did the first night, 'We will get married anyway.' "

On cross-examination, witness stated she was 21 years old; that she went with defendant about three weeks before they were engaged; he proposed on the 18th day of May, 1924; they were in a car driving to Newkirk to get a girl friend to take her to her house; "the first intercourse he had with me was Wednesday following the 18th of May, 1924; it was not exactly willingly that I submitted; I protested, but did not kick or

fight him; it was partly force; I had a conversation with defendant about a week before the child was born. Dr. Pryor attended me at the birth of the child; I became pregnant about the 20th or 21st, somewhere along there in May; figuring from the 19th day of February, I figure it was along about the 20th or 21st of May."

Quite a number of questions were propounded to the prosecuting witness, but we have substantially set out all the testimony material and necessary to arrive at a proper opinion.

Zela McMasters, a sister of the prosecuting witness, was called, and, in substance, testified she knew the defendant; he kept company with her sister; the best she could remember "he began coming about May, 1924, I think; he came most every night; I would say three or four times a week; I don't know when they became engaged, except she said it was on her birthday; defendant took her to Stillwater in 1924, and he came back with her; sister's child was born in February, 1925; defendant was at her home two weeks before the child was born; he kept company with her regularly or steadily after that; sister went back to Stillwater in the summer 1925; I saw defendant and Veril in the act of sexual intercourse out in the car in front of our house the last of October or the first of November, 1924; only saw them have intercourse one time; defendant came back to see my sister after the baby was born; he acted like a sweetheart as much or more so than he did before; Mother and I saw him in town, and I told him there was no use to pretend he did not know Veril was pregnant because she had written a letter, and he did not answer it; my mother spoke up and asked him why he had not been down; my mother asked him if he did not know he was under obligations to Veril and why he retracted his promise; he said they sometimes retract themselves; I did not say much of anything. This

conversation was after I had seen them having sexual intercourse."

On cross-examination, she stated it was along the last of October, or the first of November, she saw the defendant and her sister have intercourse; the child was born in February, 1925; "I was sleeping in the front room that night; it was along toward midnight; sister was on his lap at the time they was having sexual intercourse; he was sitting in the seat; I could see what they were doing from where I was; in conversation with the defendant at Dr. Pryor's house, I told him I sent for him to come down; my mother spoke up, and said, 'Be careful, Zela;' I don't remember about her saying anything about it being a public place; I don't think I said, 'I don't give a damn if it is.' I told him he had better come down."

Mrs. Elsie McMasters, called on behalf of the state, testified that her family and the Hodo family used to live close to each other in Missouri; "defendant started going with Veril some time in February or April, something like that, in 1924; he came over from one to three times a week; in a way I objected to him keeping company with her; I did not much blame her, she was the only grown girl and he was the only young man; they went to the same Sunday school; I don't know whether they became engaged in May or not, I think so; Veril went away to school in May, 1924; defendant kept company with her up to along in the fall, when she came down to Newkirk, that was November, 1924; there were no other boys going with Veril at the time; the child was born in February, 1925; Veril did not say whose child it was; since April, 1924, she had never had a date with any one else; she never went out with anybody else but him; she worked in the Sunday school when she went out with him; Veril went to school in May, 1925, after the child was born; I first learned she was pregnant in December, 1924; I had a conversation with defendant on Tuesday after I learned of Veril's condition; he came down to the

house, and I went outside the door and asked him if he knew of her condition, and he said, 'Yes.' I said, 'Pleas Hodo, do you know you are under obligations to Veril?' and he said, 'No, I don't think I am now.' I asked him when he had retracted the promise, and he said promises retract themselves some time, and I said this is one of the times it had best be kept; I tried to get him to marry her then, and he objected on account of his lodge; said he would be ruined in the Masonic Lodge, and that he was a Klan and so on, he never could get into any lodge, that he would be a marked man all his life, and would have to go clear to Canada; I asked what about her, and he said they soon forget about a girl; I asked him if he would marry her after the child was born, 'Veril just thinks everything of you,' and he said, 'God knows I love her enough.' "

On cross-examination, witness stated that Veril never went with Pleas to a dance at Gueda Springs; he said in the preliminary she had gone with him different places; she did not remember whether she had or not; "I called this child mine all the time; I don't remember just what time the defendant and Veril went down to the Rock schoolhouse; they organized a Sunday school the first time they went out together; he came to our house when he first came to this country; we was acquainted with the family in Missouri; I don't think I ever asked Veril who was the father of the child; Zela did not curse defendant the time we had a conversation with him in front of Dr. Pryor's house; she said, 'You low down dirty cur;' she told him she was just going to give him one week to make good; I don't think she used the word, 'damn'; I think defendant came down to the house the next night after that and Zela told him he was too late; she never told me the child belonged to Pleas until she swore out the papers; I did not tell Dr. Pryor that Veril did not know who was the father of the child."

The prosecuting witness was recalled, and stated, "I was not married at the time defendant had sexual intercourse with me, am not married now, and never have been married."

This is, in substance, all of the testimony introduced by the state in chief. At the close of said testimony, defendant demurred to the evidence offered on the part of the plaintiff on the ground and for the reason that the same failed to prove the defendant has committed a crime against the laws of the state of Oklahoma and is insufficient to convict the defendant, and that there is no corroboration of the complaining witness to any of the elements of the crime, that there is no corroboration as to the acts of sexual intercourse, and there is no corroboration as to her chastity. The demurrer of the defendant was overruled, and defendant duly excepted.

The defendant in his own behalf testified, in substance, he had known the McMasters family all his life; he had been to their home in Missouri; he was married one time, but was a widower and unmarried at the time prosecuting witness testified to his being with her; he moved from Missouri to near Dilworth, and lived about three-quarters of a mile from the McMasters family; they were on friendly terms and he often visited them; the first time he ever went with Veril McMasters was about the 20th of April, 1924; he went with her to a revival meeting; "I believe I was with her the next Sunday; I drove down to her home, I suppose it was on purpose to see her; when I got down to her home, her mother told me Veril had gone to Newkirk; I told her if she would tell me where she was I would bring her home; her mother said she was at Sherrods; I went to Sherrods, and Miss Sherrod and Veril and I went to a ball game, and I brought Veril to Dilworth; there was no one with me on the way home with Veril; this was the first time we were ever anywhere alone; the next time I was with her was the 16th day of May, 1924;

she wrote me an invitation to her birthday party about the 18th of May; I was down to see her on Friday night after I came from work; I got Veril and we drove to where Veril's sister was, got Zela, and drove to the Sherrods and got Grace and took them back to McMasters; I was not alone with Veril on that occasion; I attended her birthday party; up to that time no proposition of marriage was made to her, nor had I made any proposal of sexual intercourse; up to the latter part of May, 1924, when I took her to Stillwater to school, I had only been with her three times, once alone." Witness identified the handwriting on letters and introduced letters written by the prosecuting witness to the defendant during the month of June, 1924, while she was attending school at Stillwater.

Defendant further testified that he did not become engaged to the prosecuting witness until September, 1924; that he never had proposed sexual intercourse to her when he was with her out north of town. He then gave some testimony about prosecuting witness assisting him in selecting a wedding ring in September; defendant denies any knowledge of having intercourse with the prosecuting witness, and denies that he knew she was pregnant until Christmas, 1924; that he took her home from school where she was teaching; "the next day I went down to talk to her about it; I asked her if she was pregnant, and she said she was, and asked her why she did not tell me before; she said the reason was she was not sure she was pregnant; I asked her what she meant by that, and she said that while she was attending school at Stillwater she and a young lady and a married woman had gone driving to Perry and went to a drug store and got some drinks; this fellow I was with talked to the druggist 'before he fixed the drinks and he put some drug in it'; that she remembered leaving the drug store to go to the car, and the next thing she remembered she woke up in her room; I asked her if she ever told her mother, and she said, 'No'; and I said, 'Why don't you tell her?' and she said she did not want to tell

her mother; the reason she had not told me was that she was not sure she was that way; I asked her if she expected me to go ahead and marry her under the circumstances, and she said, 'Certainly not'; I told her I could not marry her now if I wanted to"; and the defendant detailed several pages of conversation along the same line, attempting to connect the prosecuting witness with Jack Crowe, whom he claims the prosecuting witness said lived at Perry. Defendant states he had a conversation with the mother of the prosecuting witness in which she asked him if he realized the condition of the prosecuting witness, and then detailed a conversation with the mother in which she stated she wanted him to go to Kansas and marry the girl, and he stated he could not do that; the mother said all she wanted him to do was to loan Veril his name; "we want a name for the child"; that he told the mother his name was all he had and "I don't care to loan it"; the mother wanted him to take his car and take Veril to Arkansas City where she could get rid of the child, and he asked the mother if she wanted to murder both the prosecuting witness and the child. Defendant denies having anything to do with the prosecuting witness; that he had no intercourse with her under promise of marriage; and in all his testimony attempts to charge the prosecuting witness with improper relations with another man which brought about her pregnancy. Defendant also introduced Dr. Pryor to show that the mother of the prosecuting witness stated she did not know who was the father of the child; and attempted in many ways to contradict the testimony of the state.

Defendant, on cross-examination, admitted he wrote to the prosecuting witness during the year 1924, and also in 1925, when she was in school at Stillwater after the baby was born. All of the testimony tends to contradict the testimony offered by the state. It is on the material points in conflict with the state's testimony; the defendant going so far as to say that after the child was born he was sorry

for the girl, and that he went with her several times, and that he wrote her letters when she returned to school in 1925, after the child was born. This is all the testimony that we deem necessary to properly consider the question raised.

Defendant has assigned nine separate errors alleged to have been committed by the trial court. The first error urged by the defendant is that the court erred in overruling defendant's demurrer to the amended information. A careful examination of the amended information shows that the information is sufficient to put the defendant upon trial, and the court did not err in overruling his demurrer.

The second error urged is that the amended information did not substantially conform to the statutes of the state of Oklahoma, and that the facts stated in the information do not constitute a public offense. This assignment of the defendant is without merit, and is not seriously urged by the defendant. The defendant urges with considerable force his third assignment, which goes to the sufficiency of the evidence to sustain the verdict of the jury.

Section 2703, C. O. S. 1921, provides: "Upon a trial for inveigling, enticing or taking away an unmarried female of previous chaste character, under the age of twenty-five years, for the purpose of prostitution, or aiding or assisting therein, or for having, under promise of marriage, seduced and had illicit connection with an unmarried female of previous chaste character, a defendant cannot be convicted upon testimony of the person injured unless she is corroborated by other evidence tending to connect the defendant with the commission of the offense."

There are four elements necessary to establish a crime of seduction of a female under a promise of marriage: First, promise of marriage; second, seduction and

illicit intercourse; third, unmarried female; and, fourth, previous chaste character.

In Harvey v. Territory, 11 Okla. 157, 65 P. 838, the court quoted with approval from the Supreme Court of Minnesota, State v. Timmens, 4 Minn. 325 (Gil. 241), as follows: "Now it cannot be intended that by being corroborated, the statute means there shall be proof of these facts, sufficient in itself to establish them independently of the testimony of the girl, as that would render the statute practically null. Parties seldom seek publicity in such matters. From their nature they transpire in secret, and it is only by accident that any positive proof can ever be brought to bear upon them except through the parties themselves. The corroboration therefore intended by the statute, is proof of those circumstances which usually form the concomitants of the main facts sought to be established, which circumstances should be sufficiently strong in themselves, and pertinent in their bearing upon the case, to satisfy the jury of the truthfulness of the witness in her testimony on the principal facts."

In the case of Cluck v. State, 9 Okla. Cr. 580, 132 P. 930, this court held: "In a prosecution for seduction under promise of marriage, the testimony of the prosecutrix must be corroborated as to the promise of marriage and the illicit intercourse, but need not be as to her being unmarried and of previous chaste character."

In this case the testimony shows conclusively that the prosecuting witness, Veril McMasters, was unmarried, and had not gone with any man other than the defendant. Upon the question of corroboration of the promise of marriage, it is not necessary that positive proof be shown, but the facts and circumstances which usually attend an engagement of marriage is sufficient for the purpose of corroborating the testimony of the prosecu-

trix. The proof need only amount to such circumstances as usually show the main facts sufficiently strong to satisfy the jury as to the truthfulness of the prosecutrix's testimony. The defendant denied any promise of marriage and the seduction of the prosecutrix, but defendant admits he kept company with the prosecutrix about the time alleged, and admits that later on in September he became engaged to her. The prosecutrix testified positively that defendant promised to marry her, and that by reason of that promise he succeeded in seducing and having sexual intercourse with her. When all the testimony is sifted down to the real facts, it shows that she consented to have sexual intercourse with the defendant upon his promise that he would marry her. The corroborating testimony relied on by the state consists mainly of the evidence of the attention of the defendant to the prosecuting witness of the character of a sweetheart and a suitor for a period of several months, during which time the defendant was attentive to the prosecuting witness and acted as lovers usually do. The defendant admits going with the prosecutrix to the schoolhouse to organize a Sunday School, and that when he called the following week it was for the purpose of seeing the prosecutrix. From circumstances detailed in the testimony, we hold the jury might properly regard them as bearing upon the question of the alleged promise of marriage; that is, defendant admits he continued to call upon the prosecutrix as late as September, 1924, and ordered a wedding ring for her, and that he continued to go with her up until the early part of the year 1925, when he claims the prosecutrix advised him of her condition.

There is some testimony also to show that after the child was born the defendant continued to go with her. It is true he attempts to say that he is sorry for her, and the fact that he is sorry for her was the reason for going out in company with her. This seems to be a case where

actions speak louder than words, and we hold the question of the sufficiency of the evidence to establish the fact of a false promise of marriage, in order to obtain her consent to sexual intercourse, was for the jury under proper instructions of the court. The offense of which the defendant has been convicted is a grave offense. A seducer acts with utmost deliberation, and coolly lays siege to the heart of his victim, and by all manner of promises and protestations of love gains her affection and subjects her will to his. Usually this is not the work of a moment, but extends over days and sometimes perhaps months. In this case the defendant was several years the senior of the prosecutrix, who was an unsuspecting girl of immature years, of limited experience, and yielded to his promises, the result of which she became pregnant and gave birth to a child.

The defendant by his testimony indicated that he has no remorse of conscience; and in conversation he claims to have had with the girl's mother he desired zealously to protect his good name. The record does not disclose that he was so considerate of the name of the prosecutrix. The courts and juries of the state cannot be too vigilant in their protection of our girls against the wiles and seductive influence of men who proclaim their love for the girl, securing her consent for illegal cohabitation, and in the dark hours of her troubles forsake her on the ground that he cannot sacrifice his good name. A careful examination of the record fails to disclose any material errors in the ruling upon the evidence or instructions of the court. In our opinion, the evidence amply supports the verdict.

The fifth proposition urged by the defendant is that the court erred in denying his request to have the court reporter report the argument of T. J. Sargent, who was assisting the county attorney, and having it made a part of the record. The record shows that, when the request

of the defendant was made to have the court reporter report the argument of T. J. Sargent, the court made the following statement: "The court denies the request to take the entire argument of counsel, and instructs the reporter to sit at the desk and listen to the argument of counsel, and that counsel for the defendant may indicate the part he wishes taken, and upon such indication being made the reporter shall take such argument as indicated, that is, by this is meant, that counsel for the state makes any statement which counsel for the defense wishes to be excluded from the consideration of the jury he shall indicate to the reporter that part of the argument to be taken down so that such point may be preserved."

The defendant excepted to the statement of the court, and urges in his argument that it was an error of the court in refusing to require the court reporter to report all of the argument of Mr. Sargent, who was assisting the prosecution in the trial.

That part of section 3065, C. O. S. 1921, material to the question raised, is as follows: "An attorney in any case pending shall have the right to request of the court or stenographer that all such statements or proceedings occurring in the presence of the stenographer or when his presence is required by such attorney, shall be taken and transcribed. A refusal of the court to permit, or, when requested, to require any statement to be taken down by the stenographer, or transcribed after being taken down, upon the same being shown by affidavit or other direct competent evidence, to the Supreme Court, shall be deemed prejudicial error, without regard to the merits thereof."

Defendant cites Corliss v. State, 12 Okla. Cr. 529, 159 P. 1015, in support of his contention. In the Corliss Case the facts are not the same as in this case. In that

case the court refused to order the reporter to take the statements of the county attorney the defendant desired to have taken. The question involved in this case is almost identical to the case of Lamm et al. v. State, 4 Okla. Cr. 641, 111 P. 1002, in which the court, after quoting the section of the statute and question raised by the defendant, said: "The record in this case shows that when the motion was made the court ruled that the court stenographer must take down all that occurred during the trial except arguments of counsel, and that the attorney for the state and counsel for the defendant would each be entitled to have the court reporter take down in shorthand any statement made in the argument to which either of them desired to object, and either party would be allowed to preserve their exceptions to the same in the record. We think that this order of the court was all that the defendants had a right to demand under the statute above quoted. It will be observed that in the express language of the statute the refusal of the court to permit, or when requested, to require, any matters that might properly be a part of a case-made for appeal or proceeding in error to be taken down by the stenographer and transcribed after being taken down, upon the same being shown by affidavit or other direct and competent evidence to the Supreme Court, shall be deemed prejudicial error, without regard to the merits thereof. We think the object of this statute was simply to enable the parties to a trial to secure a record upon appeal, and that it does not force the judge to have the stenographer take down any statement that would not be subject to review upon appeal. It does not mean that the court stenographer should be required to take down the entire speeches of counsel for both sides of the case where no objection is made to such speeches. It gives the counsel the right to have any given statement to which they object, and which they desire to incorporate in a case-made, taken down by the stenographer, and, upon

refusal of the court to have this done, reversible error is committed, without regard to the merits thereof. Indeed, it would be a needless and senseless thing to require a stenographer to take down everything said by counsel to which no objection was made. It would greatly encumber the record and force this court to waste a great deal of time in reading absolutely useless matter." Dickinson, Receiver, et al. v. Whitaker, 75 Okla. 243, 182 P. 901.

It is true that the Dickinson v. Whitaker Case is a civil case, but the same principle is laid down and adhered to as is laid down in our criminal reports. We hold that the object of the statute in question is simply to enable the defendant in a trial to secure the record upon appeal, and was not intended to force the court to have the stenographer take down any statements that would not be subject to review on appeal. We therefore hold that the ruling of the trial court upon the question was proper. The jury in this case was extremely lenient in imposing the penalty on the defendant.

Finding no error prejudicial to the rights of the defendant sufficient to warrant this court in awarding a new trial, the judgment of the trial court is affirmed.

EDWARDS, P. J., and CHAPPELL, J., concur.