## HOLLAND v. STATE.

No. A-11267.   March 7, 1951.

(229 P. 2d 215.)

414

Lowrance & Sadler, Sulphur, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Sam H. Lattimore, Asst. Atty. Gen., for defendant in error.

JONES, J.   The defendant, Alvin D. Holland, was charged by an information filed in the district court of Murray county with the crime of seduction under promise

of marriage; was tried; convicted; and pursuant to the verdict of the jury was sentenced to pay a fine of $550.

Two assignments of error are presented in the brief of defendant. First, the evidence was wholly insufficient to warrant a finding of guilt under the statutory charge of seduction under promise of marriage. Second, the defendant did not receive a preliminary examination.

The statute under which this prosecution was instituted provides:

"Every person who, under promise of marriage, seduces and has illicit connection with any unmarried female of previous chaste character, is punishable by imprisonment in the penitentiary not exceeding five years, or by imprisonment in a county jail not exceeding one year, or by a fine not exceeding one thousand dollars, or by both such fine and imprisonment." 21 O.S. 1941 § 1120.

By statute it is further provided that a conviction may not be sustained upon the testimony of the person injured unless she is corroborated by other evidence tending to connect the defendant with the commission of the offense. 22 O.S. 1941 § 744.

The illicit sexual relationship between the parties is admitted by the defendant but he contends that the proof wholly fails to show that the acts were committed under promise of marriage on his part.

Audra Mae Hale, the prosecutrix, testified that she was employed in the office of the county treasurer of Murray county at Sulphur; that defendant was the son of the sheriff of the county; that in the spring of 1947 the defendant was attending school at Denton, Texas, but came home on week-ends; that in April, 1947, she

was at a carnival in Sulphur with two other girls; that one of her girl companions, Louella Griffin, was acquainted with defendant and Morris Gentry, his companion; that through Louella Griffin she became acquainted with defendant on that evening; that the five of them visited at the carnival and then drove to the town of Davis in defendant's car; that after defendant had returned to school he wrote to her and asked her for a date for the next week-end, which request she granted; that commencing on the next week-end and continuing for several months she had one and sometimes two dates a week with defendant, generally on Friday and Saturday nights; that during a three or four weeks recess between the date of the summer school and the commencement of the fall term, the defendant was at Sulphur continuously and they were together often during that period; that shortly after defendant commenced dating her he showed her an engagement ring he had purchased while he was in the navy and tried to get her to wear it, but she refused because they had not been going together long enough at that time; that in the summer of 1947 defendant proposed marriage to her and she agreed; that they first planned to marry and live in Denton, Texas, then later they decided to wait until he had finished school, then they would marry and live on a farm where he would own a dairy; that defendant wrote her several letters during the time he was at school in which he stated his ardent love for her. Several of these letters were properly identified and admitted in evidence. We have examined each of them. In the letter of May 21, 1947, it appears evident that the defendant had suggested sexual relations on the date the preceding week-end and had been refused, because in the letter, among other things, defendant stated:

"I felt sorta guilty about my being so mean to you last Friday nite, Darling. You have a lot of S. A. Honey! Course, I have no intention of twisting your arm, Honey —in fact, it's no good that way."

In this same letter he further stated:

"You are a wonderful person, Audra. Naturally, you have some faults and I have many—no one is perfect. I don't know of any person that seems to be as wonderful as you are—nor rates as high in my estimation. I think of you a lot, Darling, and it's all good thinking too."

In another letter he stated:

"You do rate much higher than I like to admit, Darling; in fact, I love you very much. We should have much more in common than we do. Maybe I just don't seem to realize what all we do enjoy together. At times, I feel that I expect too much from a girl. In return, I offer her so little. This may be a selfish idea that I have, at any rate, it will appear that way from an outsider. It all adds up to the fact that I expect a lovable wife to be a combination of a sports fiend and a good housewife. * * *

"* * *

"I miss you a lot Audrey, but Saturday will come along before you even realize that I have been absent."

The prosecutrix said that they became engaged to be married in the latter part of July, 1947. She further stated that about the first of August, 1947, she submitted to an act of sexual intercourse with defendant. The questions were then asked:

"Q. Under what belief and promise did you submit to sexual intercourse? A. On promise of marriage. Q. Would you have submitted if he hadn't made such promises? A. No. Q. Had you ever had sexual intercourse with a man before, or since, except him? A. No, sir, I have not."

She further testified that she had sexual intercourse with him at various times subsequent to that date until the early part of October, 1947; that she became pregnant in October, 1947 but she did not actually know it to be a fact until several weeks later; that her monthly periods were irregular and that she went to a doctor in the latter part of October after she had failed to menstruate at the time that it was expected and that the doctor gave her some medicine but that it did not help her; that the defendant continued to insist on being in love with her until she divulged the fact of her pregnancy to him, which she did over the telephone; that the defendant at that time told her to come on to Denton, Texas, and they would be married immediately; that she purchased two wedding rings from a jewelry store in Sulphur after the conversation with defendant over the telephone and departed immediately for Denton; that after she arrived at Denton defendant refused to marry her, but insisted that it would be better for both of them because he was still in school for her to procure an abortion; that he then took her to Dallas, Texas, to several doctors, but they were unable to find any doctor who would perform the abortion; that defendant then called his brother who worked in Oklahoma City and made arrangements to send Audra to Oklahoma City where the brother was to secure a doctor who would perform the abortion; that the prosecutrix went directly to Oklahoma City where she met the brother of defendant who took her to several doctors; that she did not desire an abortion, and returned to her home in Sulphur. In defendant's letter of July 29th he stated:

"Got your letter as we expected or anticipated. Will have to disagree with some of the things you say, however. Naturally, I don't disagree violently, nor without

just cause. On the whole, it was a swell letter, Darling. I like to know your opinions, reactions, and beliefs, so keep telling me them there things. I don't expect people to see things exactly alike and I make no pauses in stating why the question should not apply to my way of reasoning.

"For instance, I do not see where the female of a normal couple is party who gives up more. That would be an unbalanced marriage to my way of thinking. I will say that there are exceptions to the general rule, but I speak from a general standpoint. The man should be the provider of income; the woman provides a great deal of happiness and contentment. * * * I can think of no problem that one member of a married couple would come in contact with that would not relate to the other, Darling. As for one party wanting to be right about anything—well I believe that the wanting to be right should be for the betterment of both parties. Not for the sake of one party wanting the privilege of being correct. I can not be lead to believe that any marriage can be established in or from a scientific bases, since human nature varies so greatly.

"Audra, Darling, I might be all wet about the way I feel about you. I think you are about the most wonderful person that I have ever met. We are different in several respects, thats true. We do have about the same background. We can understand each other's problems in a sort of sensible manner. I see things that I want, and I'm willing to work a great deal to possess those things. Futhermore, I am satisfied with what I possess. I think you a more conservative. You take in the consideration that you may have a change of feeling, stop me if I'm a bit wrong. That is why I said a few things that perhaps were not the correct form of stating last week-end. I make few pretences about hiding the way I feel about someone I think a great deal of. I like to play it straight from the heart. Maybe like, 'Either It's Love Or It Isn't.' I've told you things about me that I wouldn't dare tell a person that I didn't love. So much for that—you are probably bored stiff already.

"* * *

"This is a punk letter, Darling, but I can't think of anything that interests me more than you! I will be home next Saturday. I will try to write an interesting letter next time, Darling.

"Be seeing you Love"

A baby was born to prosecutrix on July 27, 1948.

Louella Griffin testified that she was with the prosecutrix when she met defendant the first time; that subsequent to that date she and Morris Gentry went along when the prosecutrix and defendant had other dates. She testified that she did not hear the defendant directly ask the prosecutrix to marry him but that on one occasion in the summer while she and her boy friend were out with defendant and prosecutrix that Audra and defendant each asked them if they would stand up with them when they got married. Counsel for defendant on cross-examination brought out the fact inadvertently that the prosecutrix had told Louella Griffin several times that she and defendant were going to be married.

Mrs. J. W. Pitman testified that Audra Hale commenced living with her in Sulphur in November, 1945, and continued to live with her until March 23, 1948; that during this period of time defendant had several dates with prosecutrix; that prosecutrix did not tell her that she and defendant were going to be married and did not discuss her affairs with her at all.

Mrs. T. K. Davenport testified that she was in the jewelry business in Sulphur; that she did not remember the exact date but in the latter part of 1947 or the first part of 1948 the prosecuting witness purchased a wedding band and engagement ring from her; that later prosecutrix brought the rings back to her store and asked her

to take the rings back, which she did after she and prosecutrix had adjusted the financial matter between them.

Doctor John Wren testified that he was the attending physician when the prosecutrix gave birth to a baby boy on July 27, 1948; that the baby appeared to be normal in every way and apparently had been conceived nine months before his birth. By referring to his office records he stated that the date of her last menstruation was October 20, 1947; that in his opinion the pregnancy had occurred in the month of October, probably the latter part, as he stated that the prosecutrix was about four months pregnant when he examined her on February 27th.

The defendant testified that he graduated from Sulphur High School and then enlisted in the navy where he served three and one-half years. He denied offering an engagement ring to the prosecutrix shortly after they commenced having dates with each other, but stated that he had purchased a wedding band and engagement ring in Seattle, Washington, while he was in the navy because he could get them without paying a luxury tax and thought that some time he would want to be married and could use them; that he told prosecutrix he had the rings and she asked to see them; that about the second or third time they had dates together he showed them to her but did not try to get her to accept the engagement ring. Defendant admitted that he had sexual relations with the prosecutrix but stated that it was with her consent and co-operation and that he never at any time promised to marry her or even intimated that he wanted to marry her; that he had several dates with Audra Hale from April, 1947, until about October 1, 1947; that he fell in love with a girl at Denton about that time and quit going with the prosecutrix; that he became engaged to the girl he met at Denton at February 1, 1948, and

had married her prior to the commencement of the trial; that they were each teaching school in Colorado at the time of the trial; that prosecutrix informed him about March 1st that she was pregnant and that she suggested marriage; that he offered to help her procure an abortion but refused to marry her; that he took her to Dallas on March 4th and "we went all over town looking for an abortionist but never did find one"; that he then called his brother in Oklahoma City and sent the prosecutrix to him. The defendant in his testimony appeared to be very arrogant and boastful with a brazen disregard for all decency. He admitted that he was lustful and that during all the time he was going with the prosecutrix he said he had his mind in the gutter. His air of braggadocio is best illustrated by his answer to the question by his own counsel as to why he didn't marry the girl after the abortion efforts failed. "I didn't marry the girl because it wasn't my kid. I would rather marry a nigger than her. I asked her why she didn't see the guys that did it." Defendant stated that the prosecutrix appeared to be well experienced in sex matters and in response to question by counsel as to how he knew, he stated that he had served three and one-half years in the navy and had been in several ports where he had had sexual intercourse with different women. He specifically denied that he ever asked Audra Hale to marry him and specifically denied ever being in love with her. He admitted that he wrote letters which were offered in evidence. He admitted that in the statement in the letter of May 21, 1947, wherein he stated "I have no intention of twisting your arm honey, in fact it's no good that way", that he was referring to sexual intercourse and meant that he was not going to force her to have intercourse with him. He admitted further that

in his letters to her he told her that she was "a very wonderful person" but that he was just spoofing her, although at that time he might have thought she was wonderful. He said he continued to think she was wonderful until she tried to force him to marry her.

Defendant in his testimony tried to leave the inference with the jury that he was not the father of the child born to the prosecutrix and stated that "she had been going with other guys". However on cross-examination he admitted writing her a letter on December 1, 1947 in which he stated:

"I do you so dirty at times Honey, I don't blame you for quitting me. The thing that I have felt rotten about is the fact that *I have deprived you the opportunity of going out with other guys.* Don't get the idea that I'm trying to give you the old brush off, but if you don't start going out with other guys once in a while, I'm going to get the idea of maybe that you like me a little bit. Naturally, I like you more than a little bit too, but I go out once in a while Honey. I did not last Summer and for quite a while this fall, but finally I decided that we should enjoy ourselves while we still have the youth and energy." (Italics ours)

This letter was written at a time when the defendant admitted that he had commenced dating another girl at Denton and had fallen in love with her. Although he stated in the letter that he was not attempting to brush off the prosecutrix it would appear that he had tired of prosecutrix and was attempting to get rid of her. Prosecutrix evidently commenced to realize at that time that defendant was not sincere. We do not know what she said to defendant but in defendant's letter of January 10, 1948, he stated:

"The last week-end wasn't so dull, Audra. And for goodness sake don't blame yourself for feeling tough.

I thought you were plently swell and I always will feel that way about you. No! I don't regret those weekends we spent together. I had some wonderful times with you too. I hate to think that you feel that your time was wasted being with me. I could never say that being with you was a waste of time!"

Several witnesses testified to the good reputation which the defendant bore in the community where he resided and that fact was not contested by the state.

In Hodo v. State, 42 Okla. Cr. 65, 274 P. 688, this court held:

"In a prosecution for seduction under promise of marriage, the testimony of the prosecutrix must be corroborated as to the promise of marriage and illicit intercourse, but need not be as to her being unmarried and of previous chaste character.

"In a prosecution for seduction, the prosecuting witness is not required to be corroborated by direct and positive proof of facts independent of her testimony, but only as to such facts and circumstances as usually form the concomitants to the main facts sought to be established, which facts should be sufficiently strong within themselves to satisfy the jury of the truthfulness of the prosecutrix in her evidence on the principal facts testified to by her."

As to the nature of the corroboration required by the statute, in the body of the opinion in Hodo v. State, supra, this court said:

"In Harvey v. Territory, 11 Okla. [156], 157, 65 P. 838, the court quoted with approval from the Supreme Court of Minnesota, State v. Timmens, 4 Minn. 325 (4 Gil. 241), as follows: 'Now it cannot be intended that by being corroborated, the statute means there shall be proof of these facts, sufficient in itself to establish them independently of the testimony of the girl, as that would render the statute practically null. Parties seldom seek

publicity in such matters. From their nature they transpire in secret, and it is only by accident that any positive proof can ever be brought to bear upon them except through the parties themselves. The corroboration therefore intended by the statute, is proof of those circumstances which usually form the concomitants of the main facts sought to be established, which circumstances should be sufficiently strong in themselves, and pertinent in their bearing upon the case; to satisfy the jury of the truthfulness of the witness in her testimony on the principal facts.'

"In the case of Cluck v. State, 9 Okla. Cr. 580, 132 P. 930, this court held: 'In a prosecution for seduction under promise of marriage, the testimony of the prosecutrix must be corroborated as to the promise of marriage and the illicit intercourse, but need not be as to her being unmarried and of previous chaste character.' "

See, also, Denham v. State, 17 Okla. Cr. 473, 192 P. 241; Butts v. State, 12 Okla. Cr. 391, 157 P. 704; Harris v. State, 18 Okla. Cr. 470, 196 P. 354.

In the instant case the prosecutrix testified that she submitted to the acts of sexual intercourse with defendant upon his specific promise of marriage. The weakest part of the state's case, however, is in sustaining this promise of marriage. When the prosecutrix was pinned down on examination as to what specific thing was said or done by defendant she was quite general in her answers, as hereinabove quoted in the summary of the evidence. However, we conclude that her statements were sufficient to show a submission to defendant under promise of marriage if believed by the jury.

Upon the question of the corroboration of the promise of marriage it is not necessary that positive proof be shown.

The proof need only amount to such circumstances as fully show the main fact sufficiently strong to satisfy the jury as to the truthfulness of the prosecutrix's testimony. The corroborating evidence in this case consists chiefly of the attention of the defendant to the prosecuting witness in the role of a sweetheart and suitor for a period of several months during which time the defendant was very attentive to the prosecuting witness. In his letters he often mentioned marriage and discussed it in such a manner as would convince anyone that it was a topic for discussion between them. In these same letters he often referred to her as the most wonderful person in the world and expressed his ardent love and devotion for her. The girl friend of prosecutrix stated that both defendant and prosecutrix asked her and her boy friend to stand up with them when they were married, which is a circumstance of corroboration. The proof established that Audra Hale was of previous chaste character, and in this respect it is well to note that defendant wholly failed in making any proof to support his rash testimony from the witness stand that, "she had been going with other guys. I wasn't the daddy of the kid."

When the entire evidence is carefully considered and especially the very affectionate letters written by defendant to Miss Hale, it is sufficient to require the trial court to submit the issue to the jury and the jury was justified in concluding that defendant won her affections and confidence, and when planning to debauch her impressed her with the good faith as to his intention to marry her and that her affection for defendant and his promise of marriage was the attributing cause that prompted her to consent to sexual intercourse.

The other question raised by counsel for defendant in his brief is worthy of discussion. It is contended that defendant did not have a preliminary examination. This contention is based upon the following facts. The first complaint charging seduction against defendant was filed before Justice of the Peace Womack. Defendant at that time had counsel who resided at Sulphur and also his brother who lived in Oklahoma City had employed counsel to represent the accused. Counsel from Oklahoma City brought a court reporter to the preliminary hearing with him who took all of the proceedings before Judge Womack and later transcribed them. At the conclusion of that preliminary examination Judge Womack refused to bind the defendant over for trial before the district court. Subsequently a new prosecution was instituted by the county attorney filing a complaint in the county court on May 10, 1948. On May 26, 1948, an affidavit for change of venue was filed and on June 4, 1948, an order was entered by the county judge transferring the case for a preliminary examination to Justice of the Peace Ben Gardner. On June 9th on motion of defendant and by agreement Justice of the Peace Gardner sent the matter back to the county court who on the same day made an order transferring the case to J. W. Dale, justice of the peace at Davis. At that time, before the order was made transferring the case to Justice Dale, counsel for defendant together with the county attorney entered into a stipulation which was made in the presence of the defendant that the case could be transferred to Judge Dale for further consideration and that the testimony in the case No. 468 before Judge Womack, which had been transcribed could "be submitted to Dale as testimony in that case and from such record the said Dale is to render the judgment as to disposition". After this

stipulation had been entered into, counsel for defendant who had come from Oklahoma City stated:

"I would like it further understood that if it is desired, that the Justice of the Peace at Davis will advise Mr. Lorance when he intends to take this matter up and render his decision and the State and the defendant, by and through his counsel, may be heard by way of argument if either cares to be heard."

On July 12, 1948 Justice of the Peace Dale entered an order based on the transcript of the testimony which had been furnished to him, directing that defendant be held for trial in the district court. This order was entered without notice to the attorneys but the transcript was sent to the county attorney who took it to counsel for defendant at Sulphur and the following endorsement was made on the transcript:

"Argument waived

"Lynn W. Norman, County Attorney

"Lowrance & Sadler,

"Attorneys for Defendant."

When the case was called for trial on December 15, 1948, and after the state had answered ready for trial, counsel for defendant asked leave of the court to withdraw the plea of not guilty which had been entered for the purpose of presenting a motion to set aside the information because of the alleged lack of a preliminary hearing. This leave was granted by the court and the motion was heard and overruled. Defendant then reentered his plea of not guilty and the trial proceeded.

This case presents a factual situation which differs somewhat from any other factual situation ever presented pertaining to a preliminary examination. This court

has often held that a preliminary examination is for the benefit of an accused and that such preliminary examination and the entire preliminary proceedings before a committing magistrate may be waived in the trial court by failure to file a motion to set aside the information before entering a plea on the merits. Ex parte Owen, 82 Okla. Cr. 415, 171 P. 2d 868; Ex parte Musgrave, 88 Okla. Cr. 192, 201 P. 2d 272; Ex parte Cartwright, 88 Okla. Cr. 206, 201 P. 2d 935. By constitutional provision and statute it is provided that in all criminal prosecutions the accused shall be confronted with the witnesses against him. Art. 2, § 20, Const.; 22 O.S. 1941 § 13. In construing this provision this court has held:

"Where the accused at a former trial or at a preliminary hearing once enjoyed his right to be confronted by a witness against him and had the privilege of cross-examining the witness, if at a subsequent trial, involving the same issues, it satisfactorily appears that the witness is sick and unable to testify, a transcript of the testimony of such witness may be introduced as the evidence of such absent witness; and it is not necessary that the transcript should be filed in the trial court as is required for a deposition." Sweet v. State, 70 Okla. Cr. 443, 107 P. 2d 817, 819; Davis v. State, 20 Okla. Cr. 203, 201 P. 1001.

In this case the defendant and his counsel were present at the time of the preliminary examination before Justice of the Peace Womack and they cross-examined the witnesses who appeared for the state. Later, in the presence of defendant in the county court before whom the complaint was pending, counsel for defendant stipulated that this testimony should be considered by the justice of the peace at Davis as the testimony in the case pending before him, and that he should render his judgment based upon such testimony. It was a sufficient

compliance with the constitutional provision that the defendant should be confronted with the witnesses against him when he appeared with his counsel and cross-examined the witnesses at the first preliminary hearing.

It appeared from the record that the justice of the peace at Davis had indicated to the county attorney that he was ready to make disposition of the case a few days before the order was made directing that defendant be held to await trial in the district court. At that time the county attorney conferred with counsel for defendant at Sulphur who talked with defendant and then advised the county attorney that they did not desire to argue the case before the justice of the peace as the father of defendant at that time was engaged in an election campaign for the office of sheriff and that to make an argument at that time might injure him in his campaign. Counsel for defendant at Oklahoma City was not advised of this state of affairs and had no knowledge that the defendant had been ordered held to await trial in the district court, or that counsel at Sulphur had waived argument until several days after the transcript had been filed in the district court.

We hesitate to place our stamp of approval upon this practice but after the fullest consideration we have concluded that under all of these facts and circumstances there has been substantial compliance with all constitutional and statutory guarantees given to the defendant for his protection and that defendant cannot now claim reversible error based upon such procedure.

The judgment and sentence of the district court of Murray county is affirmed.

BRETT, P. J., concurs.

POWELL, J., not participating.